Thomas **EINHORN** and William
D. Wright, Appellants,

v.

William **LaCHANCE**, Individually and in his official capacity as Director of Aviation Management, Hermann Hospital Estate; E. Don Walker, individually and in his official capacity as President of Hermann Hospital Estate; Ron Stutes, individually and in his capacity as Chief Operating Officer of Hermann Hospital; The Hermann Trust f/k/a Hermann Hospital Estate, by and through its Trustees, Ralph L. O'Connor, Walter Mischer, Jr., Edward Randall, III, Leonel Castillo, John Chase, Melinda Perrin, and Mark White, Appellees.

No. 01–90–00769–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

Jan. 16, 1992.

John A. Buckley, Jr., Andrew J. Mytelka, Janet L. Rushing, Galveston, for appellants.

A.L. Dent, Stephen W. Smith, Houston, for appellees.

Before SAM BASS, DUNN and PRICE,* JJ.

## OPINION ON MOTION FOR REHEARING

PRICE, Justice (Assigned).

Appellants have filed a motion for rehearing. We overrule the motion. However, we withdraw our earlier opinion dated October 24, 1991, and substitute this opinion in lieu thereof.

Thomas Einhorn and William D. Wright appeal from a summary judgment in favor of defendants/appellees, William La-Chance, individually and in his official capacity as the Director of Aviation Management, Hermann Hospital Trust, E. Don Walker, individually and in his official capacity as President of Hermann Hospital Trust, Ron Stutes, individually and in his capacity as the chief operating officer of Hermann Hospital, and the Hermann Hospital Trust by and through its trustees ("Hermann Hospital").

In 1976, Hermann Hospital contracted with Evergreen Aviation to provide Life Flight services for the hospital. In 1982, Hermann Hospital formed its own Life Flight program and contracted with other hospitals to provide services to those hospitals.

Einhorn and Wright were life flight pilots who worked in Hermann Hospital's program from 1982 until 1986. During their employment, they became involved in a dispute with Hermann Hospital regarding the hospital's policies of overtime compensation and safety regulations.

In August 1984, appellants organized an international professional organization for Life Flight pilots, the National Emergency Medical Services Pilots Association (NEMSPA), to deal with ongoing safety problems in the airborne emergency medical industry. In February 1985, appellants wrote a letter to Hermann Hospital management expressing their concerns regarding safety in the Hermann Life Flight program.

Appellants were fired on January 21, 1986. Appellants contend that they were terminated and discredited by Hermann Hospital in an attempt to stifle their protest and to prevent exposure of Hermann Hospital's alleged numerous illegal actions. They protested their firing to the National Labor Relations Board, which concluded that appellants did not sustain their burden of establishing that they were discharged for reasons other than those advanced by Hermann. On September 4, 1986, appellants filed a $6.3 million suit in the United States District Court for the Southern District of Texas in which they asserted that the defendants' actions violated several federal and state statutes. In that suit, appellants raised the state law defamation claims that resulted in this appeal.

On August 8, 1988, the United States District Court granted summary judgment in favor of the defendants on all claims. Except for the allegations of defamation, the United States Court of Appeals for the Fifth Circuit affirmed the summary judgment. Severing the defamation claims from all the other claims, the fifth circuit reversed the judgment concerning that claim, and remanded the defamation claims to the federal district court. That court dismissed the case without prejudice because of lack of jurisdiction.

On December 12, 1989, appellants filed this action in the state court alleging, as defamatory, the following seven statements:

(A) On January 22, 1986, LaChance allegedly made a statement to a Dr. Strother of Galveston UTMB Hospital "relating to misrepresentation of conflicts of interest plaintiffs allegedly had with a [Hermann Hospital] fixed-wing program that never existed."

---

* The Honorable Frank C. Price, former justice, Court of Appeals, First District of Texas at Houston, participating by assignment.

(B) On February 20, 1985, LaChance allegedly stated to a Floyd Helm that "Einhorn and Wright were attempting to form a union."

(C) On February 20, 1985, LaChance allegedly told a Larry Adams that "Einhorn and Wright were attempting to form a union."

(D) On January 20, 1987, LaChance allegedly told R. Gradison of the ABC television network that, "Einhorn and Wright were incompetent [Life Flight] pilots and troublemakers."

(E) In January 1987, LaChance allegedly made some unspecified statements "to K. Norton and others defaming the professional skills and character of Einhorn and Wright."

(F) In the spring of 1986, LaChance allegedly told L. Adams that LaChance "had gotten rid of troublemakers Einhorn and Wright."

(G) A statement on March 8, 1989, made to reporters for the Houston Post, the Houston Chronicle, and wire services that plaintiff Wright was fired for reasons relating "solely to work performance."

On February 5, 1990, appellees filed their first amended motion for summary judgment, and as a basis thereof asserted the following:

(1) There is no summary judgment evidence that the defamatory statements were made (applicable to statements D and F);

(2) The alleged statements are incapable of defamatory meaning as a matter of law (applicable to statements A, B, C, and G);

(3) The alleged statements are substantially true (applicable to statements B and C);

(4) The alleged statements are constitutionally protected opinion (applicable to statements D, E, and F); and

(5) There is no evidence of actual malice, a required element of a public figure plaintiff's proof (applicable to statements A, B, C, D, E, F, and G).

To support their motion, appellees introduced summary judgment evidence consisting of 25 exhibits, including LaChance's affidavit in which he:

(1) denied making any statement concerning the pilots which he knew to be false;

(2) denied making any statement concerning the pilots about which he entertained serious doubts as to its truth;

(3) affirmed and supported his belief that Wright and Einhorn were assisting in the establishment of a fixed wing ambulance service in competition with Hermann Hospital, a direct conflict of interest;

(4) affirmed and supported his belief that Wright and Einhorn were attempting to form a union or similar organization for EMS pilots;

(5) explained that his comments to Ken Norton regarding Wright and Einhorn were based on his belief that the two pilots were using NEMSPA as a forum for their personal vendetta against Hermann;

(6) affirmed and supported his belief that Wright and Einhorn were "liars," based among other things on false statements made by Wright and Einhorn in their federal complaint; and

(7) affirmed and supported his belief that Wright and Einhorn were "incompetent [Life Flight] pilots," based on Wright's negligence in a 1983 helicopter crash, the plaintiffs' poor work performance at Hermann, and their conflict of interest in setting up a competing business.

On May 29, 1990, the trial court granted summary judgment for appellees. However, the order did not specify any grounds on which the court relied to grant the motion.

■ A defendant who moves for summary judgment has the burden of showing as a matter of law that no material issue of fact exists for the plaintiff's cause of action. *Arnold v. National County Mut. Fire Ins. Co.*, 725 S.W.2d 165, 166–67 (Tex. 1987). This may be accomplished by defendant's summary judgment evidence showing that at least one element of plaintiff's cause of action has been established conclu-

sively against the plaintiff. *Gray v. Bertrand,* 723 S.W.2d 957, 958 (Tex.1987). A summary judgment for the defendant disposing of the entire case is proper only if, as a matter of law, the plaintiff could not succeed upon any theories pled. *Delgado v. Burns,* 656 S.W.2d 428, 429 (Tex.1983).

In Texas, summary judgment may be based on "uncontroverted testimonial evidence of an interested witness . . . if the evidence is clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and *could have been readily controverted.*" TEX.R.CIV.P. 166a(c) (emphasis added); *Casso v. Brand,* 776 S.W.2d 551, 559 (Tex.1989). An affidavit must show affirmatively that it is based on personal knowledge and that the facts sought to be proved would be "admissible in evidence" at a conventional trial. *Brownlee v. Brownlee,* 665 S.W.2d 111, 112 (Tex.1984); TEX.R.CIV.P. 166a(f). The affidavit itself must set forth facts and show the affiant's competency, and the allegations contained in the affidavit must be direct, unequivocal, and such that perjury is assignable. *Keenan v. Gibraltar Sav. Ass'n,* 754 S.W.2d 392, 394 (Tex.App.—Houston [14th Dist.] 1988, no writ). Affidavits may not be based on hearsay. *Lopez v. Hink,* 757 S.W.2d 449, 451 (Tex. App.—Houston [14th Dist.] 1988, no writ). However, inadmissible hearsay admitted without objection shall not be denied probative value merely because it is hearsay. *Dolenz v. A.B.,* 742 S.W.2d 82, 83–84 n. 2 (Tex.App.—Dallas 1987, writ denied).

When, as in this case, a trial court's order granting summary judgment does not specify the grounds relied on for its ruling, summary judgment will be affirmed on appeal if any of the theories advanced are meritorious. *Carr v. Brasher,* 776 S.W.2d 567, 569 (Tex.1989). Thus, we must consider whether any of the grounds asserted by defendants supports the summary judgment.

## NO SUMMARY JUDGMENT EVIDENCE THAT THE DEFAMATORY STATEMENTS TO GRADISON AND ADAMS WERE MADE (APPLICABLE TO STATEMENTS D AND F)

In an affidavit, LaChance states:

I may have mentioned that Wright and Einhorn had attempted to cause trouble for the hospital before by their baseless complaints to governmental agencies such as the FAA. However, at no time during this interview [with Gradison] did I ever state that Wright and Einhorn were 'incompetent LF pilots,' 'troublemakers,' or words to that effect.

In another affidavit, Einhorn presents hearsay evidence that controverts LaChance's denial:

I have been told that LaChance . . . told Larry Adams that he had gotten rid of the troublemakers (i.e., Don Wright and myself).

Robin Gradison told me that LaChance stated in her interview of LaChance that Don Wright and I were incompetent Life Flight pilots and troublemakers.

Although affidavits supporting and opposing motions for summary judgment must "set forth such facts as would be admissible in evidence . . . [d]efects in the form of affidavits or attachments will not be grounds for reversal unless specifically pointed out by objection. . . ." TEX. R.CIV.P. 166a(f). Because appellees did not object to Einhorn's affidavit, they waived any complaint concerning inadmissible evidence as part of the summary judgment record. In reviewing a summary judgment record, a court cannot consider evidence that favors the movant's position unless it is uncontroverted, and evidence favorable to the nonmovant will be taken as true. *Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546, 549 (Tex.1985). Thus, the trial judge could not have relied on this ground for its summary judgment ruling.

## THE ALLEGED STATEMENTS REGARDING THE PILOTS' ALLEGED CONFLICT OF INTEREST, UNION ACTIVITIES, AND REASON FOR TERMINATION ARE INCAPABLE OF DEFAMATORY MEANING AS A MATTER OF LAW (APPLICABLE TO STATEMENTS A, B, C, AND G)

A statement is defamatory if the words tend to injure a person's reputa-

tion, exposing the person to public hatred, contempt, ridicule, or financial injury. Tex. Civ.Prac. & Rem.Code Ann. § 73.001 (Vernon 1986). Whether words are capable of the defamatory meaning the plaintiff attributes to them is a question of law for the court. *Musser v. Smith Protective Serv., Inc.*, 723 S.W.2d 653, 654–55 (Tex. 1987). The court construes the statement as a whole in light of surrounding circumstances based upon how a person of ordinary intelligence would perceive the entire statement. *Id.* Only when the court determines the language is ambiguous or of doubtful import should the jury then decide the statement's meaning and the effect the statement's publication has on an ordinary reader. *Id.*

 The general rule is "oral words though false and opprobrious are not actionable without pleading and proof of special damages." *Buck v. Savage*, 323 S.W.2d 363, 368 (Tex.Civ.App.—Houston 1959, writ ref'd n.r.e.). However, an exception to this general rule is that words not otherwise actionable per se sometimes become actionable if they refer to a person engaged in a particular business or profession, where they charge him with fraud, indirect dealings, or incapacity, and tend to injure him in his trade, occupation, employment, or business. *Id.* Because LaChance's statement to Dr. Strother charged appellants with indirect dealing, this statement fits within the exception. Therefore, statement A only is capable of defamatory meaning as a matter of law.

 Appellants claim that LaChance's statements, that they were "attempting to form a union" (statements B and C), were defamatory because of the airborne emergency medical services (EMS) industry's prejudice against unions and union activity. Appellants rely on the affidavit of Michael Burke, chairman of the board of NEMSPA, in which he states:

> When a pilot is accused of being or represented by an operator to be a union member, sympathizer, or organizer, the claim negatively impacts the individual in his or her ability to obtain or maintain employment as an EMS pilot. Within the

industry, the individual who is accused or represented to be a part of union activities will find it difficult, if not impossible, to find employment in the airborne EMS industry.

However, the reaction of Burke is not typical of the meaning an ordinary person would impute to the statements. Organizing a union is a right protected by federal law, not a crime or unethical act. Therefore, as a matter of law, statements B and C were not defamatory.

 Wright complains that the statement that he was fired for reasons relating "solely to work performance" was defamatory. Because the statement complained of is nonspecific, statement G is not capable of a defamatory meaning.

The granting of summary judgment was proper as to statements B, C, and G.

## THE ALLEGED STATEMENTS CONCERNING APPELLANTS' ATTEMPTS TO FORM A UNION ARE SUBSTANTIALLY TRUE (APPLICABLE TO STATEMENTS B AND C)

Because we have determined that these statements were not capable of defamatory meaning, as a matter of law, this ground does not have to be addressed.

## THE ALLEGED STATEMENTS ARE CONSTITUTIONALLY PROTECTED OPINION (APPLICABLE TO STATEMENTS D, E, AND F)

 The line between absolutely privileged opinion and actionable assertions of fact are questions of law for the court. *Yiamouyiannis v. Thompson*, 764 S.W.2d 338, 341 (Tex.App.—San Antonio 1988, writ denied). When the topic is a public issue, speakers may express their opinions about their opponents' views and qualifications without having to prove the substantial "truth" of those opinions in a defamation case. *Id.*

 A public controversy is not simply a matter of interest to the public; it must be a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way. *Waldbaum v. Fairchild Publications,*

*Inc.*, 627 F.2d 1287, 1296 (D.C.Cir.1980). The Supreme Court has made clear that essentially private concerns or disagreements do not become public controversies simply because they attract attention. *Time, Inc. v. Firestone*, 424 U.S. 448, 454–55, 96 S.Ct. 958, 965–66, 47 L.Ed.2d 154 (1976). Rather, a public controversy is a dispute that in fact has received public attention because its ramifications will be felt by persons who are not direct participants. *Waldbaum*, 627 F.2d at 1296.

Examination of the summary judgment evidence reveals the following:

(1) In 1984, prior to appellants' filing suit, appellants, "recognizing that the Hermann Hospital Life Flight program provided not only insufficient compensation to the pilots for the job done, *but also created a very dangerous situation for those pilots and the persons flying with them, as well as others in the community,* organized NEMSPA, an international organization to further their concern for aeromedical safety."

(Emphasis added.)

(2) Wright has served as president of NEMSPA and Einhorn has served as vice-president.

(3) In 1988, "American Medical News" published an article, "Crusading for Safety," which stated, "Leading the drive for aeromedical safety has become a way of life for Don Wright and Tom Einhorn of the National EMS Pilot's Ass'n." According to the article, appellants' crusade for aeromedical safety *"began more than three years ago."* The article also recounted how appellants "found themselves at the center of a controversy attracting media attention."

(Emphasis added.)

(4) Wright testified before a U.S. Senate subcommittee at a hearing on the Employee Health and Safety Whistleblower Protection Act. He stated he was "blackballed" after complaining about unsafe flying conditions in Hermann's Life Flight program.

(5) July, 1985, Wright filed a charge against Hermann Hospital with the National Labor Relations Board contending he was transferred "to more onerous or arduous duties because of his activities and/or membership in behalf of NEMSPA."

(6) Appellants, under the auspices of NEMSPA, developed a publication called "Airnet," which addressed issues of aeromedical safety in general, and the Hermann Hospital Life Flight program in particular.

(7) After appellants filed their federal lawsuit, their legal actions against Hermann became the subject of much media attention.

This evidence, to which appellants did not object, clearly shows appellants "thrust" themselves into the "vortex" of the public issue involving aeromedical safety and engaged the public's attention in an attempt to influence its outcome.

Under the principles of *Waldbaum* and *Time, Inc.*, the references to appellants as incompetent, troublemakers, and liars are assertions of pure opinion. These terms of derision, considered in context and in light of the EMS debate are not capable of proof one way or the other. Therefore, as to each of these statements, the absolute constitutional privilege applies. *See Waldbaum*, 627 F.2d at 1296; *Time, Inc.*, 424 U.S. at 454–55, 96 S.Ct. at 965–66 (1976).

The granting of summary judgment was proper as to statements D, E and F.

## NO EVIDENCE OF ACTUAL MALICE, A REQUIRED ELEMENT OF A PUBLIC FIGURE PLAINTIFF'S PROOF (APPLICABLE TO STATEMENTS A, B, C, D, E, F, AND G)

Because we have determined that statements B, C, and G are not capable of defamatory meaning, as a matter of law, and statements D, E, and F are constitutionally protected opinion, the issue of actual malice pertains only to statement A.

The degree and burden of proof required in a defamation case hinges on the status of the plaintiff as either a public figure or private individual. The parties in this case differ as to how to classify appellants. Appellants classify themselves as private individuals. Defendants conclude that al-

though appellants could not be considered public figures for all purposes, they were public figures for the limited range of issues in this cause of action.

In trying to determine who is a public figure, the Supreme Court in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 351, 94 S.Ct. 2997, 3012, 41 L.Ed.2d 789 (1974) created two classes of public figures in addition to government officials: general-purpose and limited-purpose public figures. General-purpose public figures are those individuals who "achieve such pervasive fame or notoriety that [they] become a public figure for all purposes and in all contexts." *Id.* Such persons have assumed so prominent a role in the affairs of society that they have become celebrities. *Tavoulareas v. Piro,* 817 F.2d 762, 772 (1987). "Absent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society," an individual should not be characterized as a general-purpose public figure. *Gertz,* 418 U.S. at 352, 94 S.Ct. at 3013. Defendants do not contend that appellants have established this kind of prominence.

Limited-purpose public figures achieve their status by "thrust[ing] themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved," *Gertz,* 418 U.S. at 345, 94 S.Ct. at 3009, or because they "voluntarily inject [themselves] or [are] drawn into a particular public controversy." *Id.* at 351, 94 S.Ct. at 3012. Defendants contend that appellants are limited-purpose public figures.

■ Whether an individual is a public figure is a matter of law for the court to decide. *Rosenblatt v. Baer,* 383 U.S. 75, 88, 86 S.Ct. 669, 677, 15 L.Ed.2d 597 (1966). To help determine limited-purpose public figure status, the District of Columbia circuit in *Tavoulareas v. Piro* developed a three-step test, which the fifth circuit adopted in *Trotter v. Jack Anderson Enter., Inc.,* 818 F.2d 431, 433 (5th Cir.1987):

(1) The controversy at issue must be public both in the sense that people are discussing it and people other than the immediate participants in the controversy are likely to feel the impact of its resolution;

(2) the plaintiff must have more than a trivial or tangential role in the controversy; and

(3) the alleged defamation must be germane to the plaintiff's participation in the controversy.

■ In undertaking this examination, this Court must look through the eyes of a reasonable person at the facts taken as a whole, *Waldbaum,* 627 F.2d at 1292, and determine the status of appellants as either public or private individuals.

■ As set out above, appellants were involved in a public controversy. Therefore, the first prong of *Trotter,* requiring a public controversy, was met. It is apparent that appellants had more than a trivial role in the controversy; thus, the second requirement of *Trotter* was met. Because there is no dispute that the allegedly defamatory statements were germane to appellants' participation in the controversy, the third requirement of *Trotter* was satisfied. Consequently, the trial judge could have found that appellants, by voluntarily injecting themselves into a particular public controversy, became limited-purpose or "vortex" public figures.

■ Although an injured party who is not a public official or public figure only has to prove that the defendants were negligent in making a defamatory statement, *Durham v. Cannon Communications, Inc.,* 645 S.W.2d 845, 851 (Tex.App.—Amarillo 1983, writ dism'd), in order for a public figure to sustain a defamation cause of action, he must prove that the defendants acted with actual malice. *New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1964). Proof of actual malice must be by clear and convincing evidence. *Gertz,* 418 U.S. at 342, 94 S.Ct. at 3008. Actual malice means the statement was made with knowledge of its falsity, or with reckless disregard for its truth or falsity. *New York Times,* 376 U.S. at 280, 84 S.Ct. at 726. "Reckless disregard" is defined as a high degree of awareness of probable falsity, for proof of

which the plaintiff must present "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts about the truth of his publication." *Id.* Although the United States Supreme Court has not decided whether this standard is also constitutionally required when public figures sue private individuals for defamation, the Texas Supreme Court, in a defamation action, *Casso v. Brand,* 776 S.W.2d 551, 554 (Tex.1989) stated, "We are reluctant to afford greater constitutional protection to members of the print and broadcast media than to ordinary citizens.... Therefore, we join those states which have extended the *New York Times* standard to defamation suits by public officials and public figures against non-media defendants."

Because we have determined that appellants are limited-purpose public figures, it was incumbent upon them to show, by clear and convincing evidence, that, in his conversation with Dr. Strother, LaChance acted with actual malice.

▮ In his affidavit, LaChance denied making any statement concerning the pilots that he knew to be false, denied making any statement about which he entertained serious doubts concerning its truth, and provided information concerning his knowledge that the statements were not false. He stated that his belief that appellants were involved in a conflict of interest was based on a conversation he had with Mike Beaumont, the manager of Bayport Aviation, a commercial aircraft vendor, in which Beaumont acknowledged that appellants had approached him with the idea of setting up a fixed-wing air ambulance service. However, appellants presented Beaumont's "sworn statement," which was not objected to by appellees, in which he stated:

> LaChance came to my office. No one else was present. He said that Hermann had just fired Einhorn and Wright for "conflict of interest." He then said, 'I called you yesterday for a specific reason. I had my attorney on the line listening, and I have a statement of what you told us. I have this statement here and I'd like you to sign it.' He then

showed me a one page typed statement. I read it and it stated that I had discussed with Einhorn and Wright about actually setting up a "fixed-wing operation." (In fact, all Einhorn and Wright had discussed with me, was to relay information that Sealy was interested in contracting out a fixed-wing service.) I told LaChance that because the statement he prepared implied that Wright and Einhorn were directly involved in setting up the fixed-wing service, I told LaChance that I would not sign the statement he had prepared.... I wish to state that although Einhorn and Wright attended the December 26, 1985 meeting I had with Dr. Strother, they did not participate in any of the conversation regarding the presentation of the Bayport program.

Such testimony contradicts LaChance's testimony that he did not make any statements with knowledge of the falsity of the statement or with reckless disregard for the truth or falsity of the statement. Concerning statement A, appellants raised a fact question on the issue of actual malice.

The granting of summary judgment was not proper as to statement A.

The judgment of the trial court is affirmed regarding statements B, C, D, E, F, and G. Regarding statement A, the judgment of the trial court is reversed and remanded for further proceedings.