The ASSOCIATED PRESS, Houston Chronicle Publishing Co., Mike Cochran, Mark Smith, and Terry Keel, Appellants,

v.

Maurice COOK, Appellee.

No. 01–98–00773–CV.

Court of Appeals of Texas, Houston (1st Dist.).

May 11, 2000.

David H. Donaldson, Jr., Austin, William W. Ogden, Joel R. White, John Phillips, Houston, Roger Neil Moss, Lufkin, Sherine Elizabeth Thomas, Amy Carter Uren, Martin Joseph Thompson, Austin, for Appellants.

Charles E. Soechting, Brian Lee Baker, San Marcos, for Appellee.

Panel consists of Chief Justice SCHNEIDER and Justices ANDELL and DUGGAN.*

## OPINION

LEE DUGGAN, Jr., Justice (Retired).

This libel case is an interlocutory appeal from the trial court's order denying summary judgment to news media defendants and their sources. Maurice Cook ("Cook"), the former Senior Ranger Captain of the Texas Rangers, sued the appellants, The Houston Chronicle Publishing Company ("the Chronicle") and its reporter Mark Smith ("Smith"), together with The Associated Press (the "AP") and its reporter Mike Cochran ("Cochran"), because of several articles that were published about him. Cook also sued Terry Keel ("Keel"), the former Travis County Sheriff who was quoted in the articles.[1] We reverse and render judgment in favor of the appellants.

### I. JURISDICTION

As a preliminary matter, this Court has jurisdiction under Civil Practice and Remedies Code section 51.014a(6).[2]

---

\* The Honorable Lee Duggan, Jr., retired Justice, Court of Appeals, First District of Texas at Houston, participating by assignment.

**1.** Cook sued other defendants who are not parties to the appeal, the Amarillo News–Globe and John Phillips, another source named in the articles. Cook nonsuited the Globe and Phillips.

**2.** Section 51.014(a)(6) provides,

A person may appeal from an interlocutory order of a district court ... that denies a

## II. BACKGROUND

The underlying story of the news articles referring to Cook concerns the Texas Rangers' investigation of the 1990 killings of David Joost, his wife Susan, and their two small children. The Rangers theorized that David Joost killed his family in anger after discovering an affair by his wife, and then committed suicide. Relatives of the Joost family did not accept this theory.[3]

Because the Rangers resisted disclosing their investigative file, the relatives of the Joost family filed a lawsuit seeking access to it under the Texas Open Records Act. The disclosure would be permitted only if the investigation was inactive. Initially, disclosure of the file was ordered by the court. However, on February 25, 1993 (nearly three years after the shootings), the court conducted another hearing to reconsider its ruling.

At the hearing, Cook testified as Ranger Chief and Custodian of DPS records.[4] He said the Rangers were still investigating evidence in support of the murder/suicide theory. This theory involved the assumption that Susan Joost was having an affair with Jerry Hill, her former employer, and that the affair somehow came to light during a lengthy, late night telephone call between the Joost and Hill residences immediately before the shootings. Cook specifically testified that "there was a lengthy phone call between the Joost residence and the attorney [Hill]" that occurred "the night before [the shootings] at about 12:00 midnight," but that the Rangers did not know the identity of the parties to the conversation because "it doesn't say who is talking. It just has two numbers talking." According to Cook, the Rangers theorized that the phone call may have disclosed the alleged affair, causing David Joost, in anger, to kill his family and then himself.

Following Cook's testimony at the hearing, the Joost family's request for disclosure of the Rangers' investigative file was denied. The Joost case was officially closed by the Rangers in 1995, at which time the investigative file was officially released. After it was released, Phillips learned that Cook falsely testified about the non-existent "late night telephone call." Therefore, Phillips filed a complaint with the Hays County District Attorney alleging that Cook committed perjury. Ultimately, Cook was not indicted by the grand jury. However, articles were published reporting the grand jury proceedings. Keel and Phillips were quoted in the articles.

## III. STANDARD OF REVIEW

When the denial of summary judgment is appealed, we apply the same standard of review that governs the granting of summary judgment. *Evans v. Dolcefino*, 986 S.W.2d 69, 75 (Tex.App.—Houston [1st Dist.] 1999, no pet.). The movant for summary judgment must show there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Tex.R. Civ. P. 166a(c); *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 644 (Tex.1995). A defendant who conclu-

---

motion for summary judgment that is based in whole or in part upon a claim against or defense by a member of the electronic or print media, acting in such capacity, or a person whose communication appears in or is published by the electronic or print media, arising under the free speech or free press clause of the First Amendment to the United States Constitution, or Article 1, Section 8, of the Texas Constitution, or Chapter 73.

**3.** They suspected the killings were hired murders because David Joost may have discovered corruption at the Texas Racing Commission. His body was discovered on the

morning that he was expected to brief the commission on a controversial contract. The family also grew suspicious because of the way the Rangers maintained tight control over the case, refusing them access to autopsy and lab reports, crime scene photographs, and other evidence. If the deaths were determined to be murder, rather than a murder suicide, the Joost family's relatives could have gained $214,000 in insurance proceeds.

**4.** Cook's testimony was incorporated as an exhibit to the Chronicle's motion for summary judgment.

sively negates at least one of the essential elements of a cause of action is entitled to summary judgment on that cause of action. *Id.* Likewise, a defendant who conclusively establishes each element of an affirmative defense is entitled to summary judgment. *Id.*

Once the movant has established a right to a summary judgment, the burden shifts to the nonmovant. *Marchal v. Webb,* 859 S.W.2d 408, 412 (Tex.App.—Houston [1st Dist.] 1993, writ denied). The nonmovant must respond to the motion for summary judgment and present to the trial court any issues that would preclude summary judgment. *City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678 (Tex. 1979); *Marchal,* 859 S.W.2d at 412. We must accept as true evidence in favor of the non-movant, indulging every reasonable inference and resolving all doubts in his or her favor. *Evans,* 986 S.W.2d at 75.

On appeal, we cannot consider any ground for reversal that was not expressly presented to the trial court by written motion, answer, or other response to the motion for summary judgment. *Clear Creek Basin Auth.,* 589 S.W.2d at 677; *Hussong v. Schwan's Sales Enter., Inc.,* 896 S.W.2d 320, 323 (Tex.App.—Houston [1st Dist.] 1995, no writ). We will affirm the summary judgment if any of the theories advanced in the motion for summary judgment is meritorious. *Cincinnati Life Ins. Co. v. Cates,* 927 S.W.2d 623, 626 (Tex.1996); *Cigna Ins. Co. v. Rubalcada,* 960 S.W.2d 408, 411 (Tex.App.—Houston [1st Dist.] 1998, no pet.).

## IV. THE HOUSTON CHRONICLE AND MARK SMITH

### A. Analysis

In the Chronicle and Smith's point of error one, they argue the trial court erred in denying their motion for summary judg-ment because they negated at least one element of each of Cook's libel claims.[5] For the reasons that follow, we agree.

■ To maintain a defamation cause of action, the plaintiff must prove that the defendant: (1) published a false statement about the plaintiff; (2) that was defamatory; (3) while acting with either actual malice, if the plaintiff was a public official or public figure, or negligence, if the plaintiff was a private individual, regarding the truth of the statement. *See Carr v. Brasher,* 776 S.W.2d 567, 569 (Tex.1989). It is undisputed that Cook, as Captain of the Rangers, was a public official.

■ Under Civil Practice and Remedies Code section 73.005, "The truth of the statement in the publication on which an action for libel is based is a defense to the action." Tex. Civ. Prac. & Rem.Code § 73.005. Similarly, a showing of substantial truth in a summary judgment case will defeat a defamation claim. *McIlvain v. Jacobs,* 794 S.W.2d 14, 15–16 (Tex.1990); *Evans,* 986 S.W.2d at 76. To determine substantial truth, we consider whether the defamatory statement was more damaging to the plaintiff in the mind of the average reader than a true statement would have been. *McIlvain,* 794 S.W.2d at 16; *Barbouti v. Hearst Corp.,* 927 S.W.2d 37, 65 (Tex.App.—Houston [1st Dist.] 1996, writ denied). This evaluation involves looking at the "gist" of the broadcast. *McIlvain,* 794 S.W.2d at 16; *KTRK Television v. Felder,* 950 S.W.2d 100, 105–106 (Tex. App.—Houston [14th Dist.] 1997, no writ). If the underlying facts as to the gist of the libelous charge are undisputed, then we can disregard any variance with respect to items of secondary importance and determine substantial truth as a matter of law. *McIlvain,* 794 S.W.2d at 16; *Felder,* 950 S.W.2d at 106. Moreover, this Court has held "the implication of a true statement,

---

5. The Chronicle and Smith's motion for summary judgment was based on five different theories: (1) the articles are substantially true; (2) the articles in dispute are privileged; (3) the articles included protected opinion, and, as a matter of law, are not defamatory; (4) the articles were published without actual malice; and (5) there is no evidence to support Cook's claims.

however unfortunate, does not vitiate the defense of truth." *Hardwick v. Houston Lighting & Power Co.*, 943 S.W.2d 183, 185 (Tex.App.—Houston [1st Dist.] 1997, no writ).

### B. The Disputed Statements

Cook's claims against the Chronicle and Smith are limited to four statements printed in three articles. The disputed statements refer to (1) the late night telephone call; (2) Cook's Fifth Amendment right; (3) Keel's statement that Cook was a "blight on law enforcement"; and (4) attorney John Phillips' statement that there was "probable cause" to indict Cook.

### 1. The Chronicle's February 8, 1996 article: *"Embattled Rangers Chief Cook to Retire"*

█ The first Chronicle article, published February 8, 1996, stated:

> The Chronicle investigation also found that Cook may have embellished or misstated facts during closed-session court testimony when he claimed he had telephone records proving a "lengthy" late-night telephone call from the Joost home to the home of Susan Joost's boss the night of the killings.
>
> In fact, phone records show no such call was made.

This disputed statement was repeated in two subsequent articles.[6]

The summary judgment evidence produced by the Chronicle and Smith establishes that this statement is substantially true. A copy of Cook's closed-court testimony at the February 25, 1993 hearing—which was the subject of the Chronicle's articles—shows Cook testified as follows:

> *A: But the thing that bothered us about this was the night before [the killings] at about 12:00 midnight or late at night, there was a lengthy phone call between the Joost residence and the attorney [Hill].*

> \* \* \*

> *A: ... And with that possible affair and a conversation from the telephone, you know, one night before this, a lengthy call from one house to the other house—*
>
> *Q: What time of night are we talking about?*
>
> *A: We're talking about 11:00 or 12:00, if I'm not mistaken, a little unusual, and it was reasonably late.*

The Chronicle's report summarizing Cook's testimony was accurate, because it was later shown that there was no late night telephone call between the Joost and Hill residences on the night before the killings. The telephone records from the Joost and Hill residences support the conclusions published in the Chronicle, and, more importantly, Cook now admits there are no telephone records corroborating his testimony. Indeed, he has explained that his testimony was based on misinformation or a misunderstanding of the facts as relayed to him by other Rangers. However, Cook's explanation for the testimony is irrelevant to whether the Chronicle accurately reported that Cook misstated the

6. The second Chronicle article, published February 9, 1996, stated:
> A Houston Chronicle investigation of the [Joost] case files after the case was officially closed last year showed ... that Cook may have embellished or misstated facts during closed-session court testimony.

The third Chronicle article, published February 24, 1996, stated:
> Cook told the judge he had telephone records proving a "lengthy" late call "the night before" the murders to the home of Jerry Hill, Susan Joost's boss and longtime friend. Cook said that phone call gave credence to the theory that Joost flew into a rage and killed his wife after discovering her on the phone with her boss.
>
> In fact, the Joost phone records show no such call was made. It is possible Cook was referring to a 9:06 p.m. call from Hill's home to the Joosts about three weeks before the killings. Hill said that call, on Feb. 15, 1990, was made on the day his son was born. He denied having an affair with Susan Joost.

facts.[7] Finally, Cook's contention that someone *might* assume from these true facts that he committed perjury is also irrelevant, because Cook cannot assert a cause of action for libel by the implication of true facts. *See Hardwick*, 943 S.W.2d at 185.

As to the first statement in dispute, we hold the Chronicle and Smith established the substantial truth of these articles as a matter of law; therefore, the trial court erred in denying summary judgment on this claim.

## 2. The Chronicle's February 9, 1996 article: *"Sources Say Top Ranger Got the Boot"*

■ Terry Keel was the Travis County Sheriff when Cook was subpoenaed by the grand jury in February 1996. Keel was quoted in the last three paragraphs of the Chronicle's February 9, 1996 article, headlined as, "Sources Say Top Ranger Got the Boot":

> "He is a blight on law enforcement," charged Travis County Sheriff Terry Keel.
>
> Asserting that he had "no ax to grind," Keel, a candidate for the Texas House, said he doubts that Cook's pending departure stems from any specific act or misdeed.
>
> "I really honestly believe it was a culmination of a lot of things, things too numerous to discuss," he said. "... Cook has caused unbelievable problems."

Keel was accurately quoted. The gist of the article containing these statements was a report that Cook was forced to resign. Cook does not dispute that he was given an ultimatum—he could choose between retiring, being fired, or transferring to another Ranger division.

■ We do not reach the question of whether Keel's statements are true or substantially true because they are assertions of opinion—not statements of fact. All assertions of opinion are protected by the First Amendment of the United States Constitution and article I, section 8 of the Texas Constitution. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–40, 94 S.Ct. 2997, 3006–07, 41 L.Ed.2d 789 (1974); *Carr*, 776 S.W.2d at 570; *Evans*, 986 S.W.2d at 78. Whether a statement is an assertion of fact or opinion is a question of law to be decided by the court. *Schauer v. Memorial Care Sys.*, 856 S.W.2d 437, 446 (Tex.App.—Houston [1st Dist.] 1993, no writ).

In the present case, we hold that Keel's statements are an expression of opinion. While Keel's statements may be objectionable to Cook, they are little more than name calling. Keel's statement that Cook was a "blight on law enforcement" is not unlike a statement that a political opponent is "widely considered an embarrassment to the judiciary and Republican party"—a statement that was considered constitutionally protected opinion, not a statement of fact. *See Howell v. Hecht*, 821 S.W.2d 627, 631 (Tex.App.—Dallas 1991, writ denied). Thus, the Chronicle and Smith cannot be held liable for publishing Keel's opinions, no matter how objectionable they are to Cook.

As to the second statement in dispute, we hold the trial court erred in denying the Chronicle and Smith summary judgment.

## 3. The Chronicle's February 24, 1996 Article: *"Former Ranger Cleared of Lying; Cook May Have Invoked the Fifth"*

■ The third article containing disputed statements reported on the grand jury proceedings that were prompted by Phillips' (the Joost family's attorney) filing a complaint against Cook with the Hays County District Attorney. Phillips' complaint alleged that Cook committed perju-

---

**7.** Even the lead investigator for the Texas Rangers, Ron Stewart, testified that Cook's testimony was not accurate, and that he "overstated" the facts.

ry when he testified at the February 25, 1993 hearing. Cook specifically complains of the following:

> **Former Ranger cleared of lying; Cook may have invoked Fifth**
>
> A Hays County grand jury has refused to indict [Cook], who had been accused of lying during a court hearing involving the mysterious 1990 slayings of a former racing commission official and his family.
>
> *Sources said Cook invoked his Fifth Amendment right to testify before the grand jury ..., refusing to testify on the grounds that he might incriminate himself.* Cook's attorney, Dick DeGuerin of Houston, refused to confirm that....

The summary judgment evidence establishes that the gist of the article is substantially true. The Chronicle and Smith presented the trial court with the affidavit of Marcos Hernandez, Jr., the Hays County District Attorney who was present in the grand jury room. Hernandez said Cook and three other members of the Texas Rangers were subpoenaed by the grand jury. Cook appeared with his attorney, Dick DeGuerin. When the grand jury called Cook to the grand jury room to testify, he did not. Instead, with Hernandez' permission, DeGuerin addressed the grand jury on Cook's behalf.

According to Hernandez' affidavit, DeGuerin told the grand jury Cook was advised not to testify, and that, if brought into the grand jury room, Cook would not testify. Although DeGuerin did not specifically refer to the Fifth Amendment by name when he addressed the grand jury, Hernandez was under the impression that Cook intended to invoke this right. After DeGuerin and the other Texas Rangers addressed the grand jury, Hernandez discussed with the grand jury Cook's refusal to testify. He informed them that they could require Cook to come into the room and refuse to testify in their presence. The consensus of the grand jury was that

they did not want to go through with that formality.

Hernandez said the only legal basis he knew for Cook's refusal to testify was by exercise of his Fifth Amendment right. Hernandez also told Phillips, after the fact, that Cook had invoked his Fifth Amendment right.

The gist of the Chronicle's article is that Cook refused to testify before the grand jury by invoking his Fifth Amendment right, he was not indicted for perjury, and he was cleared by the grand jury. Nonetheless, Cook argues the statement that *"Sources said [he] invoked his Fifth Amendment right to testify before the grand jury ..., refusing to testify on the grounds that he might incriminate himself"* is false because (1) he did not personally appear before the grand jury, (2) he was never in a position to invoke his Fifth Amendment right, (3) he did not lie during his in camera testimony, and (4) he had no reason to refuse to testify on the grounds that he might incriminate himself because he had not committed perjury. Cook's argument is without merit. *See Swate v. Schiffers,* 975 S.W.2d 70, 75 (Tex.App.—San Antonio 1998, pet. denied) (finding statement that "assault" on investigator was substantially true, despite a not guilty judgment on charge, because a truthful statement would not have changed the effect of article in the average reader's mind); *Castillo v. State,* 901 S.W.2d 550, 551–52 (Tex.App.—El Paso 1995, pet ref'd) (stating that when party's counsel informs court that party intends to invoke the Fifth Amendment, that is sufficient to keep the party from testifying).

Statements made by DeGuerin in representing Cook to the grand jury are attributable to Cook. *See Gavenda v. Strata Energy, Inc.,* 705 S.W.2d 690, 693 (Tex. 1986) (stating attorney-client relationship is agency; thus, attorney's acts are client's acts). Thus, when DeGuerin appeared before the grand jury as counsel representing Cook, Cook also appeared before the grand jury; when DeGuerin told the grand

jury Cook would refuse to testify, Cook refused to testify. *See Castillo*, 901 S.W.2d at 552.

The only possible conclusion is that Cook's refusal to testify was based on the Fifth Amendment, even if it was not mentioned by name. If it is false that Cook did not invoke his Fifth Amendment right, Cook had the burden to prove its falsity, which he did not; indeed, he has never even suggested that he had some other legal basis for his refusal to testify.

■■■ We conclude that the statement that Cook refused to testify on the grounds that he might incriminate himself is substantially true.[8]

■■■ Phillips was quoted in the February 24, 1996 article about the perjury investigation. The relevant portion of the article states:

> "What Maurice Cook testified to three years ago was what he had been told or seen in written reports," said DeGuerin. "It's clear he got his understanding of the events from (Texas Ranger) Ron Stewart. All he knew is what Stewart told him ... through oral and written reports."
>
> * * *
>
> DeGuerin said a transcribed report from an interview Stewart conducted with Jerry Hill included discussion of a possible call shortly before the Joosts' deaths. DeGuerin argued that Cook, reading the interview tran-

script, would have reason to believe there was such a late-night call.

> John Phillips, attorney for the Joost family who presented information to the grand jury, took a harsher view: "There is no doubt (Cook) was lying. He gave specific details of a phone conversation, specific times and a specific day. There was more than probable cause to indict Cook."

Cook is not claiming that the Chronicle misquoted Phillips. Indeed, Phillips still believes Cook was lying and that there was probable cause to indict Cook for perjury. Instead, Cook claims that "Phillips said [I] committed perjury and Smith knew at the time he published the statement it was false."

As stated before, the gist of the Chronicle's February 24, 1996 article is that Cook refused to testify before the grand jury, he was not indicted for perjury, and he was cleared by the grand jury. The article contained statements by Cook's attorney, and by Phillips, the person who brought the complaint against Cook and who testified before the grand jury. Phillips was quoted on his opinion concerning the grand jury proceedings, which is that he believed Cook lied. It would not be surprising to the average reader that Phillips, *the person who filed the perjury complaint*, believed Cook was lying. Moreover, Phillips' statement concerning the phone call is both literally and substantially true—at the February 25, 1993 hearing regarding the Rangers' investigative file,

---

8. Even if it is not substantially true that Cook invoked his Fifth Amendment right, exercising a legal right is not defamatory as a matter of law. *See Banfield v. Laidlaw Waste Sys.*, 977 S.W.2d 434, 439 (Tex.App.—Dallas 1998, pet. denied) (finding statements that plaintiffs were "troublemakers" and "ringleaders" was not defamatory as a matter of law because union organizing is a federal right). A statement is defamatory if the words tend to injure a person's reputation, exposing the person to public hatred, contempt, ridicule, or financial injury. *Einhorn v. LaChance*, 823 S.W.2d 405, 410–11 (Tex.App.—Houston [1st Dist.] 1992, writ dism'd w.o.j.). Whether words are

capable of the defamatory meaning the plaintiff attributes to them is a question of law for the court. *Id.* at 411. The court construes the statement as a whole in light of surrounding circumstances based upon how a person of ordinary intelligence would perceive the entire statement. *Id.* Here, a person of ordinary intelligence would not construe the article any differently if it had said that DeGuerin addressed the grand jury on Cook's behalf, and that Cook did not testify, because such a person knows the only legal basis for Cook's refusal to testify was by exercise of his Fifth Amendment right.

Cook's closed-session testimony includes specific details of a time (11:00 p.m. to midnight) and a day for the phone call (March 4, 1990, the day before the Joost shootings).

■ Cook also complains of the following statement in the Chronicle's February 24, 1996 article:

> The issue that brought Cook before the grand jury was whether the Rangers captain committed perjury in a February 23, 1993, closed court hearing....
>
> *Cook told the judge he had telephone records* proving a "lengthy" late call "the night before" the murders to the home of Jerry Hill, Susan Joost's boss and longtime friend.

Cook argues that this statement is false because he did not specifically tell the judge he had telephone records to prove the late night phone call took place. Although Cook may not have specifically said he had telephone records, it was implied by his testimony that such phone records existed and that he had seen them. Indeed, Cook testified as the Rangers' custodian of records, which inherently suggests he had the records. Cook said *"there was a lengthy phone call between the Joost residence and [the Hill residence]."* When asked whether he knew if the "late night telephone call" was between Susan Joost and her friend, Kathy Hill, Cook responded:

> *A: There's no way of knowing because it doesn't say who is talking. It just has two numbers talking.*

Clearly, "it" refers to a tangible telephone record that shows (1) a sending and receiving telephone number, (2) the date of the call, and (3) the time of the call. Cook does not offer any other explanation for what "it" refers to; instead, he claims,

rather disingenuously, that he does not know what "it" refers to. This statement is not more damaging to Cook's reputation than his current version of the facts, which is that he repeatedly and inaccurately testified to a telephone call that was never made, *and* to the contents of records that he now claims he had never seen and knew nothing about. Thus, we hold the Chronicle's February 24, 1996 article is substantially true as a matter of law, and the trial court erred in denying summary judgment on this claim.

We sustain the Chronicle and Smith's point of error one. We render judgment for the Chronicle and Smith on Cook's claims for libel.[9]

## V. THE ASSOCIATED PRESS AND MIKE COCHRAN

In point of error one, the AP and Cochran argue the trial court erred in denying their motion for summary judgment on Cook's claims for libel. Cook's libel claims against the AP and Cochran are now limited to two articles: (1) a February 8, 1996 AP wire story accurately quoting Keel's criticisms; and (2) a June 7, 1996 AP wire story that incorrectly stated Cook owned 12,000 acres of land in Trinity County (he owned only 12 acres).

### A. Quoting Keel

As explained in section IV. B. (2) of this opinion, we hold Keel's statements are assertions of his opinion, protected by the Constitution. The AP and Cochran, like the Chronicle and Smith, cannot be held liable for publishing his criticisms.

### B. Cook's Land Ownership

■ It is undisputed that the AP made a mistake. However, the AP argues that Cook did not establish, by clear and convincing evidence, that the misstatement was published with actual malice.[10] There-

---

9. We note that in his Third Amended Petition, the last live pleading before the trial court, Cook abandoned his non-libel claims against the Chronicle and Smith.

10. Cook's claim against Cochran for the land ownership misstatement must fail for the simple reason that he cannot be held liable for an article that he neither wrote nor published. *See Carr,* 776 S.W.2d at 569 (stating publica-

fore, it argues it was entitled to summary judgment as a matter of law. We agree.

 A libel defendant is entitled to summary judgment under Texas law if it can negate actual malice as a matter of law.. *WFAA–TV, Inc. v. McLemore,* 978 S.W.2d 568, 574 (Tex.1998). A libel defendant can negate actual malice by presenting evidence that shows it did not publish the alleged defamatory statement with actual knowledge of any falsity or with reckless disregard for its truth. *Id.* It is insufficient to show the defendant made an error in judgment. *Carr,* 776 S.W.2d at 571; *See Casso,* 776 S.W.2d at 558.

 The defendant's burden to negate actual malice is by clear and convincing evidence. *McLemore,* 978 S.W.2d at 574. An uncontroverted affidavit by the person publishing the statement that indicates the statement was not made with actual malice is sufficient to meet the burden to negate actual malice as a matter of law. *Id.*

To negate actual malice, the AP presented summary judgment evidence to the trial court that includes an affidavit from Terri Langford, the AP reporter who wrote the article containing this statement. She said that after Cook held a press conference to announce the filing of this lawsuit, she was sent to Trinity County to get a copy of the petition. Langford wanted to determine why Cook had filed the suit in Trinity County, far away from the Austin area where he lived and worked. While waiting for a copy of the petition, Langford also reviewed property tax records showing that Cook owned "12.000" acres of land in Trinity County. Initially, she understood the figure to mean "12,000," and this information was reported in the AP's story. She said that at the time she reported this article, she believed the statements to be true and accurate.

To negate actual malice, the AP also presented an affidavit from John Lumpkin, the AP Dallas Bureau Chief, as summary judgment evidence. Lumpkin said that he believed the 12,000 acre statement was true when the article was published. He said he was comfortable relying on Langford's work because she is a skilled investigative reporter. However, after the article was published, and on his own initiative, Lumpkin asked for the 12,000 acre figure to be double-checked. The AP ran a correction immediately after it determined Cook owned only 12 acres.

We find that the AP met its summary judgment burden to negate actual malice. *See, e.g., McLemore,* 978 S.W.2d at 574; *Casso,* 776 S.W.2d at 558; *Rogers v. Cassidy,* 946 S.W.2d 439, 446 (Tex.App.—Corpus Christi 1997, no writ); *Morris v. Dallas Morning News, Inc.,* 934 S.W.2d 410, 421 (Tex.App.—Waco 1996, writ denied) (holding actual malice negated by uncontroverted affidavits supporting summary judgment). Once the AP met its summary judgment burden with this evidence, the burden shifted to Cook. Cook had to offer specific, affirmative evidence showing the AP either knew the publication was false or entertained serious doubts as to its. truth. *See Howell,* 821 S.W.2d at 631.

 Cook does not point this Court to any summary judgment evidence in the record as evidence of actual malice. Instead, he argues that we should examine the relationship between the parties, Cook, the AP, and Cochran, and from this relationship we should find that the personal animosity between Cook and Cochran is evidence of actual malice. However, actual malice in defamation is a term of art that does not include ill will, evil motive, or spite. Cook's argument, therefore, is insufficient to overcome the AP's summary judgment evidence negating actual malice. *See Schauer,* 856 S.W.2d at 450 (holding that mere surmise or suspicion of malice

tion is an essential element of a libel action). It is undisputed that he did not write or contribute to the article in any way. Thus,

Cochran was entitled to summary judgment on this claim.

does not carry the probative force necessary to form the basis of a legal inference of malice).

Because Cook presented no controverting summary judgment evidence that the AP believed that the statement in question was false or published with reckless disregard for the truth, the trial court erred in denying summary judgment to AP on this claim.[11] Therefore, we sustain the AP and Cochran's point of error one.

We reverse and render judgment for the AP and Cochran on Cook's libel claims.

## VI. TERRY KEEL

In points of error one and two, Keel argues the trial court erred in denying his motion for summary judgment on Cook's claims for libel, tortious interference with a contract, and intentional infliction of emotional distress.

### A. Libel

Keel was sued for his criticisms that were re-published by the Chronicle and the AP. As explained in section IV. B. (2) of this opinion, we hold Keel's statements are assertions of his opinion, protected by the Constitution.[12]

### B. Claims against Keel for Tortious Interference with a Contract and Intentional Infliction of Emotional Distress

Keel was sued for tortious interference with a contract and intentional infliction of emotional distress. Keel argues he is entitled to absolute and official immunity because he was sued in his capacity as an elected representative to the House of Representatives.[13] Although Keel is not entitled to absolute legislative immunity, we hold that he is entitled to official immunity.

#### 1. Relevant Facts

After Cook retired from the Rangers, he wanted to be the committee clerk [14] for the House Public Safety Committee. He expressed this interest to State Representative Keith Oakley, who chaired the committee during the 74th Regular Session and expected to be re-appointed to chair the committee during the 75th Regular Session. Cook said he told Oakley he was involved in litigation against Keel, but that Oakley did not express any concerns and did not think it would be a problem. However, because Cook approached Oakley before the legislature had convened, and before the committee was even selected, Oakley told Cook it would not be appropriate to have a committee clerk on staff before the committee chairs were named.

When the 75th Regular Session convened on January 14, 1997, Keel was a newly elected State Representative. Keel expected to be on the House Public Safety

---

11. In his brief, even Cook acknowledges that the reporter "inexplicably" reported that he owned 12,000 acres, because the reporter was "apparently totally unaware that land ownership can be quantified in fractional sections of an acre." This acknowledges that the statement was merely a mistake, made without actual malice. Interestingly enough, not only did Cook *not* sue Langford for making the statement, he did not even depose her.

12. The parties dispute our jurisdiction over Cook's defamation claim against Keel. Because Keel's statements were quoted in the print media, we have jurisdiction over this claim under Civil Practice and Remedies Code section 51.014(a)(6).

13. We have jurisdiction over these claims under Civil Practice and Remedies Code section 51.014(a)(5), which states that a party may

pursue an interlocutory appeal when the trial court denies a motion for summary judgment that is based on an assertion of immunity by an individual who is an officer or employee of the state. Even though Keel urged other theories to support summary judgment on these claims, we may consider only whether he was entitled to summary judgment based on his immunity defenses. *See Boozier v. Hambrick,* 846 S.W.2d 593, 596 (Tex.App.—Houston [1st Dist.] 1993, no writ) (explaining that the legislative intent was to provide interlocutory appellate review only of the merits of immunity defense).

14. We note that employees of the House are at-will employees, who do not have a long-term contractual relationship with the House.

Committee. On the second day of the session, and before committee appointments were made, Keel approached Oakley and asked him whether he intended to hire Cook and whether he was aware of the ongoing litigation between them. When Oakley responded that he was, Keel ended the conversation by saying he did not know whether Oakley was aware of it.

Oakley was re-appointed to chair the committee on January 23, 1997. As chair of the committee, Oakley was authorized to employ and discharge the staff and employees authorized for the committee. On the day before committee assignments were made, Keel approached Oakley again, on the House floor, and asked about Oakley's plans to hire Cook. When Oakley said he still intended to hire Cook, Keel told him that hiring Cook would not be good for the committee because of things that might come to light during the lawsuit. Sometime thereafter, Cook went to Oakley's office, at which time Oakley told Cook he would not be able to have the job because, with Keel on the committee, he did not think the tension would be good for the committee. Cook was never listed as a government employee in any public documents, nor was Cook ever paid for any work as committee clerk.

### 2. *Absolute Legislative Immunity*

 Keel argued that he was entitled to absolute legislative immunity from Cook's claims. To be entitled to legislative immunity, Keel was required to show that his actions were functionally legislative. *See Lopez v. Trevino*, 2 S.W.3d 472, 473 (Tex.App.—San Antonio 1999, pet. dism'd w.o.j.). Courts have applied two tests in determining whether an action is legislative. *See id.* Under the first test, the court considers whether the underlying facts on which a decision is made are "legislative facts," such as generalizations concerning a policy or state of affairs, or whether the underlying facts are more specific, such as those that relate to particular individuals or situations. *Id.* If the

underlying facts are generalizations, the action is legislative; if they are specific, the decision is administrative. *Id.* Under the second test, the court focuses on the impact of the action. *Lopez*, 2 S.W.3d at 474. If the action involves the establishment of a general policy, it is legislative; if it singles out specific individuals, it is administrative. *Id.*

Courts generally consider employment and personnel decisions to be administrative in nature because they affect a single individual. *See Lopez*, 2 S.W.3d at 474 (citations omitted). For example, where the action involves the elimination of a position due to budgetary considerations, the decision is legislative because it involves policy considerations and affects the position, not simply the individual. *Bogan v. Scott–Harris*, 523 U.S. 44, 118 S.Ct. 966, 973, 140 L.Ed.2d 79 (1998). However, where the action involves the termination of a particular employee, the action is administrative. *Id.*

Applying the two tests to this case and assuming Cook was employed by the House, we conclude that Keel did not establish that he is entitled to absolute legislative immunity—the underlying facts singled out and related to a specific individual, Cook, rendering the action administrative.

### 3. *Official Immunity*

 In the motion for summary judgment, Keel also argued that he was entitled to official immunity. As a government official, Keel is immune from suit for the performance of discretionary duties within the scope of his authority, as long as he acted in good faith. *See City of Lancaster v. Chambers*, 883 S.W.2d 650, 653 (Tex.1994); *City of Columbus v. Barnstone*, 921 S.W.2d 268, 272 (Tex.App.—Houston [1st Dist.] 1995, no writ). To be entitled to summary judgment, Keel had to conclusively establish each of these elements as a matter of law.

■ We find that Keel is entitled to official immunity, because he established that his communications to Oakley were part of a discretionary duty, within the scope of his authority, and that he acted in good faith. A discretionary duty requires the exercise of personal deliberation, decision, and judgment, whereas ministerial duties are defined with precision and certainty, leaving nothing to the individual's judgment or discretion. *Chambers*, 883 S.W.2d at 654; *Barnstone*, 921 S.W.2d at 272. Whether an action is discretionary or ministerial is a question of law. *Johnson v. Texas Dep't. of Transp.*, 905 S.W.2d 394, 397 (Tex.App.—Austin 1995, no writ).

We find that Keel's communicating to Oakley was part of a discretionary duty, because it required the exercise of his personal deliberation, decision, and judgment. He reasonably believed it was within his duties to report a possible staffing problem to the chairman of a legislative committee, and apparently the chairman agreed it would be problematic for the two men to work on the same committee. Cook did not offer any controverting proof to show this was not discretionary, or that this was not within the scope of Keel's duties.

■ Finally, the parties dispute whether Keel acted in good faith. The test for whether an official acted in "good faith" is whether a reasonably prudent official, under the same or similar circumstances, could have believed that his actions were reasonable. *Chambers*, 883 S.W.2d at 654. Once the defendant has met his burden of proof on good faith, the burden shifts to the plaintiff to produce controverting evidence—that is, the plaintiff must show that no reasonable person in the defendant's position could have thought the facts were such that they justified the defendant's acts. *Id.* at 657.

Keel argues that, when he communicated with Oakley, he was acting in good faith because a reasonable state representative could have believed he had a duty to communicate a potential conflict and staffing problem to the committee chairman. He argues that obviously Oakley agreed that it might cause tension and negatively influence the effectiveness of the committee. We agree.

As supporting evidence to negate good faith, Cook offered Keel's deposition testimony regarding a long and tortured history between the two, beginning with when Cook was designated to testify as an expert witness in a case alleging civil rights violations against Keel.[15] However, Cook did not show that a reasonable person in Keel's position could not have believed communicating with the chairman was justified. In fact, the chairman agreed, which indicates Keel's concerns were reasonable.

We conclude that Keel was entitled to official immunity. The trial court erred in denying summary judgment on this ground.

We sustain Keel's points of error one and two, and reverse and render judgment in favor of Keel on Cook's claims for libel, tortious interference with a contract, and intentional infliction of emotional distress.

## VII. SUMMARY

We sustain the Chronicle and Smith's point of error one, the AP and Cochran's point of error one, and Keel's points of error one and two. We reverse and render judgment that Maurice Cook take nothing by way of his libel claims against the Chronicle, Smith, the AP, Cochran, and Keel, and his claims for tortious interference with a contract and intentional infliction of emotional distress against Keel.

---

**15.** Cook says he told the plaintiff's lawyer in that case that he would not testify unless he was subpoenaed; he was never subpoenaed and he never testified.