

# NUMBER 13-10-00366-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

**POST-NEWSWEEK STATIONS, HOUSTON, INC.
D/B/A KPRC-TV, F/K/A POST-NEWSWEEK STATIONS,
HOUSTON GP, INC., POST NEWSWEEK STATIONS,
INC., POST NEWSWEEK STATIONS, HOUSTON
HOLDINGS (LIMITED), INC., STEPHEN DEAN, SKIP
VALET, RICK MCFARLAND, AND BRIAN SASSER,**　　　　**Appellants,**

**v.**

**DANIEL DUGI, M.D.,**　　　　　　　　　　　　　　　　**Appellee.**

## On appeal from the 267th District Court
## of DeWitt County, Texas.

## MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Rodriguez and Perkes
Memorandum Opinion by Chief Justice Valdez**

Appellants, Post-Newsweek Stations, Houston, Inc. d/b/a KPRC-TV, f/k/a Post-

Newsweek Stations, Houston GP, Inc., Post Newsweek Stations, Inc., Post Newsweek

Stations, Houston Holdings (Limited), Inc., Stephen Dean, Skip Valet, Rick McFarland, and Brian Sasser (collectively "KPRC"), appeal the trial court's denial of their traditional and no-evidence motions for summary judgment in favor of appellee, Daniel Dugi, M.D.[1] We affirm.

## I.    BACKGROUND

Timothy Goosby, a registered nurse anesthetist who formerly worked at the Cuero Community Hospital ("CCH"), contacted KPRC, claiming that when he worked at CCH, Dr. Dugi had tested an illegal drug on his patients without their consent. Goosby worked at CCH for approximately four years, and in 2003, he apparently resigned.[2] In 2007, Goosby contacted Dean, a reporter with KPRC, complaining "about the retaliation that was suffered from [Goosby's] reporting going back to 2003."[3] Goosby did not recall whether, in his initial contact with Dean, he mentioned Dr. Dugi and a drug called Providex[4]; however, Goosby stated that his complaints usually involved drug testing.[5]

---

[1] Generally, an order denying a motion for summary judgment is not appealable. *See Cincinnati Life Ins. Co. v. Cates*, 927 S.W.2d 623, 625 (Tex. 1996) (citing *Novak v. Stevens*, 596 S.W.2d 848, 849 (Tex. 1980)). However, an exception to this rule applies in cases involving a media defendant in a defamation case. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(6) (Vernon 2008) (allowing an appeal of a trial court's interlocutory order denying "a motion for summary judgment that is based in whole or in part upon a claim against or defense by a member of the electronic or print media, acting in such capacity, or a person whose communication appears in or is published by the electronic or print media, arising under the free speech or free press clause of the First Amendment to the United States Constitution, or Article I, Section 8, of the Texas Constitution, or Chapter 73").

[2] At his deposition, Goosby acknowledged that his nurse's license in Texas had been suspended, but he claimed that the Texas Board of Nursing ("TBN") had retaliated against him for reporting "criminal activity in Texas." Goosby testified that he had been "reporting" his allegations since 2003. Goosby claimed that the TBN "wrote an obscene order and [had] sent it out on the Internet and to other states suggesting very strongly that [Goosby had] a drug problem." Goosby admitted that he had failed to disclose on his "Temporary License/Endorsement Application" that he had two DWI offenses and that the TBN suspended his license for that failure.

[3] Goosby stated that he contacted more than four other news-media outlets, including "Oprah."

[4] Goosby testified that the active ingredient in Providex is benzethonium chloride and agreed that

2

Goosby testified that Dean contacted him in November 2007 and that he probably told Dean at that time about "the Providex and the testing." During Goosby's deposition, a video tape of Goosby's interview with Dean was played. In it, Goosby stated that he observed Dr. Dugi inject Providex, which is a topical cream, into a patient's abdomen and that Dr. Dugi told him that Providex, if applied into a person's eyes, would cure cataracts. Goosby claimed that a "Mrs. Hall" also witnessed Dr. Dugi inject Providex into one of his patients and that Becky Murray actually applied Providex to patients at CCH.[6] Goosby claimed that Murray told him that the nurses at CCH were being "forced to do the illegal drug testing" and that they were not obtaining consent from the patients.[7]

Goosby claimed that James Buckner, the former CEO of CCH, encouraged him to contact the media regarding the alleged illegal drug tests. According to Goosby, the Texas Board of Nursing ("TBN") was well aware of the illegal drug testing since 2003, but he had problems convincing that agency to conduct an investigation; Goosby's impression was that people thought the story was improbable. Goosby claimed that in

it is "a fairly well-known and well-accepted ingredient in topical analgesics."

[5] Goosby did not have a copy of the email he initially sent to Dean.

[6] In an affidavit, Murray acknowledged that she had applied Providex on Dr. Dugi's patients. However, she also stated, "I did not see Dr. Dugi test or experiment on any patients at [CCH]. I never told Nurse Goosby that I had seen any such experiments or tests." Murray further stated, "I never asked Nurse Goosby to help me expose Dr. Dugi's treatment of his patients with Providex . . . . If I believed that Dr. Dugi was doing something improper with his patients then I would have reported it to the Texas Medical Board and the [CCH's] administration."

[7] In a letter to the FBI that Goosby stated was only a draft and never sent, Goosby claimed that Murray was willing to testify about the illegal drug testing in exchange for immunity. However, Goosby admitted that he had not talked to Murray regarding the issue before he drafted the letter. Therefore, Goosby claimed that he changed the letter that he actually sent to the Department of Justice. That letter is not in the record, and Goosby did not know if he had a copy of that letter. Goosby admitted that Murray did not state that she would testify in exchange for immunity.

3

2007, Buckner was willing to "come forward" and "back" Goosby in reporting the illegal drug testing program at CCH. Goosby stated that according to Buckner, the drug testing was "small compared to" the retaliation Goosby allegedly suffered from the TBN for being a whistleblower. Goosby testified that Buckner resigned as CEO of CCH "partially because of the retaliation they were doing against [Goosby]."[8]

Goosby stated that he compared Dr. Dugi's alleged drug testing with the Tuskegee study—a well-known study involving syphilis that resulted in the death of some of the participants who were all African-American—because he believed that "it had to do with minorities withheld therapies, inappropriate testing without patient's knowledge or consent." Goosby claimed that he was not implying that Dr. Dugi's alleged testing had anything to do with race.[9] Goosby admitted that he was aware of the racial breakdown of Dr. Dugi's patients who received Providex. Goosby stated that he had heard a rumor that one of Dr. Dugi's patients died as a result of the use of Providex, but that he did not know the patient's name and he had not told Dean about the rumor. Goosby acknowledged that he did not personally know of anyone being harmed by the use of Providex.

Dean, an investigative reporter with KPRC, interviewed Goosby. At his deposition, Dean stated that Goosby provided copies of some of the written complaints Goosby filed with several agencies; however, Dean acknowledged that Goosby failed to

---

[8] Buckner testified at deposition that he was not aware of any illegal drug testing at CCH when he was CEO and that he resigned for other reasons unrelated to any of Goosby's allegations.

[9] Goosby testified that he believes that all patients are minorities regardless of their race or ethnic background; therefore, he compared the Tuskegee testing to Dr. Dugi's use of Providex because all patients are minorities.

give him copies of all of the complaints he filed. According to Dean, after his interview with Goosby, he contacted personnel with the FDA who assured him that the agency was conducting an investigation into Goosby's allegations.[10]

On January 21, 2008, KPRC ran the first news broadcast concerning Dr. Dugi and the drug Providex. A news reporter began the broadcast by stating, "Tonight, [KPRC] uncovers a mysterious medical experiment possibly affecting more than a thousand patients. Former hospital workers are blowing the whistle tonight . . . claiming a doctor was using Texas patients as human guinea pigs . . . and the patients had no idea." (Ellipses in original.) Dean stated that Pat Flores, who lives in Cuero, was bothered by the fact that "illegal and poor immigrants were the subjects of the testing, according to this complaint filed with the Food and Drug Administration [by Goosby]." Dean then reported that in his complaint, Goosby "likened" the study to "the infamous *Tuskegee study* in the 1930s, when the government experimented with a new syphilis medicine on hundreds of black men without telling them. But the difference in 2008 Texas is one doctor who stands to profit." (Emphasis in original). Goosby noted that Dr. Dugi had a "great financial involvement" in the drug testing, while he did not believe the "Tuskegee people had financial gain." In a video interview, Buckner stated, "If there was ever a written consent given to a patient to accept the use of this drug, I am completely unaware. I don't think we did at our hospital." When asked if he knew what substance CCH was buying or applying to the patients, Buckner replied, "No, we didn't." Buckner then claimed that when he asked Dr. Dugi to reveal the ingredients in Providex,

_____

[10] During his deposition, Goosby claimed that Dean gave him the idea to contact the FDA and that he began sending letters to the FDA after his communications with Dean.

5

Dr. Dugi said he could not give him that information because "'[i]t's still patent pending, waiting for FDA approval." Dean then reported that the FDA had informed him that "it has never heard of the drug" and that "no human testing was ever approved." Dr. Dugi told Dean that the product is FDA registered as required. Dean is then shown in the broadcast entering Providex's "NDC number"[11] into the FDA's website. Dean states that when he enters the number into the website, "there's nothing on file" and that an FDA official told him that "there's no such number."[12] When asked if his patients knew that he was "testing" Providex on them, Dr. Dugi responded, "I had informed consent from everyone." Dean stated that Dr. Dugi would not show him any proof that his patients had signed any consent forms and that Dr. Dugi's "former colleagues say it's because they never saw any consent." It is then reported by KPRC that the FDA does not comment on pending investigations and that KPRC will be "watching for any action from that agency." The anchor ends the report by stating, "Tomorrow morning at 6:50, our investigation continues with complaints that were filed with several government agencies, but nothing was done until we started digging."

In the next broadcast, KPRC stated, "The F-D-A has now launched an investigation into human drug-testing uncovered by [KPRC]" and that FDA officials have stated that Providex is an "unapproved medicine that was never cleared for experiments

---

[11] Dean explained that the NDC number is the "national control number, a serial number assigned to all <u>approved</u> drugs." (Emphasis in original.)

[12] In his summary judgment evidence, Dr. Dugi included an incident report, wherein Avis Lynn "Lynnie" Jalufka, R.Ph., the pharmacist-in-charge at CCH, stated that Providex contains an NDC number created by "The Drug Listing Act of 1972" that "'requires registered drug establishments to provide the Food and Drug Administration (FDA) with a current list of all drugs manufactured, prepared, propagated, compounded, or processed by it for commercial distribution.'"

6

or any use on humans. Yet, we found hundreds of patients are part of testing [in] several towns south of Houston." Pictures taken from a notebook that Dr. Dugi gave Dean were then shown. The pictures depict patients with wounds before and after treatment with Providex. Dean claims that the pictures show "some horrible wounds" that were "treated as experiments, even though the FDA tells [KPRC] no human testing was ever permitted for the un-approved drug called 'Durable Closure' or 'Providex.'" Dean then discloses that Dr. Dugi is the "principal investigator" and an investor in the Texas company that manufactures Providex. Dean then stated that the law is clear that when new drugs are being tested, the FDA has to approve "every step, with lots of paperwork and all patients have to consent in writing." Dean then reports that Goosby showed him many complaints that he allegedly filed with the FDA, the FBI, the State Medical Board, State Pharmacy Board, and State Legislatures, but that "nothing had happened so he called [KPRC]." According to Dean, Mari Robinson, "Director of the Texas Medical Board Enforcement," told him that that agency could not investigate Dr. Dugi because the complaint from Goosby had not listed a patient's name. Dean revealed that Providex's active ingredient is benzethonium chloride, which according to Dean is not listed at the FDA's database, and that he could not find "a single doctor or pharmacist who's ever heard of it." Dean later states that Ron Gourley, owner of Activ—the company that manufactured Providex—sent an email to KPRC stating that thousands of patients had benefitted from the use of Providex; his company is following the FDA's "strict guidelines"; and he was suspicious of the motives of "the people

7

reporting the illegal testing allegations." KPRC then directed the viewers to go to its website to review emails from Activ.

In its third broadcast, which ran on February 8, 2008, KPRC reported that the hospital board had called an emergency meeting to start an internal investigation at CCH and that the board's chairman said, "he doesn't think there's any wrongdoing." Dean reported that "tonight, federal prosecutors [had] issued a subpoena" and that the investigators were gathering information as "their own investigation pick[ed] up steam." KPRC reported that Goosby's reporting of Dr. Dugi's actions "cost him his career." The report ends with information that a "law firm" sent a letter to KPRC informing it that "the drug" was not tested on patients at CCH and that the drug "was allowed under the F-D-A's over-the-counter medicine policies."

In the next broadcast, that ran on February 20, 2008, KPRC reported that the drugs that KPRC had been investigating had "stopped being sold as part of an F-D-A investigation launched because of [KPRC]." Dean reported that the drugs that were being tested on patients throughout south Texas and that the FDA had "told" KPRC that the drugs were "never approved for testing on humans" and had been "pulled" from the market "as part of the federal investigation."[13] KPRC repeated that the NDC number did not exist in the FDA's website database and that the FDA had informed KPRC that it had "never approved the drug for use on any patients." KPRC stated that Goosby had

---

[13] KPRC points to nothing in the record supporting a conclusion that Providex was pulled from the market due to a federal investigation, and we find none in this voluminous record. The only evidence in the record regarding the reason Providex was pulled from the market is Gourley's affidavit. In it, Gourley stated that Activ voluntarily recalled Providex for reasons unrelated to Goosby's allegations. Gourley explained that the voluntary recall was initiated "to clarify some statements on the Activ Group's website about how Providex works" and that the "voluntary recall had nothing to do with the safety or efficacy of Providex."

"[written] complaints to the F-D-A, the F-B-I and the Texas Medical Board saying patients didn't even know the drug was being tested on them."

In the next broadcast that ran on April 16, 2008, KPRC claimed that "two separate government investigations [were] underway tonight, following [its] series of reports on a possible drug experiment uncovered by [KPRC]." The reporter stated that "State agency and federal investigators are now looking into allegations by hospital workers south of Houston, who say patients were used as human guinea pigs without their knowledge." Dean reported that Buckner, who "was [previously] in charge" of CCH told KPRC "he stocked his hospital with an unlicensed drug for use on patients who may not have known they were part of an un-approved experiment," and that he had "just" been visited by FDA investigators. Dean stated that the Texas Medical Board "could take action against [Dr. Dugi] for using an unapproved drug, or if the agency proves he tested it on patients without the patients knowing they were part of a study, something Dr. Dugi denies."

KPRC also posted several articles written by Dean with the same information on its website. Most of the online articles repeated what had already been reported. In one of the articles, Dean reported that Buckner said that he left his position as CEO of CCH, "partly because of the dispute over this drug." Dean stated that the FDA did not approve drug trials of Providex. Dean also stated that the FDA "had already launched a criminal investigation in response to [KPRC's] reports.

After the broadcasts ran, Dr. Dugi sued KPRC and Goosby for defamation. KPRC filed traditional and a no-evidence motions for summary judgment. The trial court

9

denied both motions. KPRC appeals the trial court's denial of its motions for summary judgment.

## II. LIMITED PURPOSE PUBLIC FIGURE

By its first issue, KPRC contends that Dr. Dugi is a limited purpose public figure,[14] which requires Dr. Dugi to prove that KPRC published its new stories with actual malice.

### A. Applicable Law

A limited purpose public figure suing a media defendant for defamation must prove that the defendant published the statement with actual malice. *Klentzman v. Brady*, 312 S.W.3d 886, 905-06 (Tex. App.—Houston [1st Dist.] 2009, no pet.) (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974)). A private figure suing a media defendant, however, must only show that the media defendant acted negligently. *Entravision Commc'ns. Corp. v. Belalcazar*, 99 S.W.3d 393, 399-400 (Tex. App.— Corpus Christi 2003, pet. denied). Whether a person is a limited purpose public figure is a question of law for the court to decide.[15] *Klentzman*, 312 S.W.3d at 904. We apply a three-part test in deciding whether a person is a limited purpose public figure: (1) was the controversy at issue public both in the sense that people are discussing it and people other than the immediate participants in the controversy are likely to feel the impact of its resolution; (2) did the plaintiff have more than a trivial or tangential role in the controversy; and (3) was the alleged defamation germane to the plaintiff's participation in the controversy. *Klentzman*, 312 S.W.3d at 904-05.

---

[14] Although there are two types of public figures—general purpose public figures and limited purpose public figures—we will limit our discussion to whether Dr. Dugi was a limited purpose public figure because KPRC does not claim he was a general purpose public figure.

[15] The trial court concluded that Dr. Dugi is not a limited purpose public figure.

> To determine whether a controversy indeed existed and, if so, to define its contours, the judge must examine whether persons actually were discussing some specific question. A general concern or interest will not suffice. The court can see if the press was covering the debate, reporting what people were saying and uncovering facts and theories to help the public formulate some judgment.

*WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 572 (Tex. 1998). Furthermore, a public controversy is more than simply a matter of interest to the public; it must be a dispute that has received public attention because the outcome affects the general public or some segment of it in an appreciable way. *Einhorn v. LaChance*, 823 S.W.2d 405, 412 (Tex. App.—Houston [1st Dist.] 1992, writ dism'd w.o.j.) (concluding that the defendants had provided evidence that the topic of aeromedical safety was a public controversy); *see Time, Inc. v. Firestone*, 424 U.S. 448, 454 (1976) (finding that the general controversy surrounding divorce is not a public controversy for purposes of analyzing whether a party is a limited purpose public figure).

> It is not enough that a plaintiff is involved or associated with a matter of public or general interest, no matter how significant or sensational. "A private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention" or is newsworthy.

*Klentzman*, 312 S.W.3d at 904.[16]

## B.     Discussion

Although KPRC generally stated in its motion for summary judgment that the issue of rural health care services is a public controversy, it did not provide any specific arguments or authority supporting its assertion. Instead, KPRC specifically argued in its

---

[16] "Even engaging in criminal conduct does not make [] a person a limited-purpose public figure." *Klentzman v. Brady*, 312 S.W.3d 886, 905 (Tex. App.—Houston [1st Dist.] 2009, no pet.).

11

motion for summary judgment that the "provision of health care services to citizens in rural areas is a matter of *public concern* at the federal and state level." (Emphasis added.) KPRC pointed out that the Texas Legislature created the Office of Rural Community Affairs, now known as the Texas Department of Rural Affairs, and the federal government has created the Office of Rural Health Policy. According to KPRC, both agencies are responsible for collecting and disseminating information on rural health care issues. KPRC then generally argued that wound care is a "specific concern for rural health care providers such as Dr. Dugi." KPRC did not identify a public controversy or provide any argument or authority supporting a conclusion that wound care is a public controversy.[17] Instead, it pointed to the state and federal government's general concern with rural medicine and wound care. KPRC also pointed out that there are numerous private associations concerned with the issue of rural health care. However, nowhere in its motion did KPRC contend that the discussion on rural health care involves opposing views.[18] In fact, it stated that the agencies involved in rural health care have "a similar mission."

To determine that there is a public controversy, the trial court must have examined whether persons were actually discussing some specific question. *See*

---

[17] KPRC did not allege in its motion for summary judgment that the public controversy concerned the use of Providex—the subject of KPRC's news articles. Moreover, they did not point to any evidence that a controversy over the use of Providex existed before its broadcasts.

[18] In its motion for summary judgment, KPRC stated, "The current national debate about health care reform includes questions about how the proposed reforms might impact rural health care services." However, KPRC did not explain how this national debate on health care reform transforms a public concern over rural health care services into a public controversy. We also note that KPRC, in its motion for summary judgment and on appeal, refers to the "public debate" regarding rural health care. However, it never identifies specifically what the public is debating in reference to rural health care. *See WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 572 (Tex. 1998) ("[T]he judge must examine whether persons actually were discussing some *specific* question.") (emphasis added).

12

*WFAA-TV, Inc.*, 978 S.W.2d at 572. To do so, the trial court could have examined whether the press was covering a debate concerning rural medicine and wound care, reporting what people were saying about the debate, and uncovering facts and theories to help the public formulate some judgment. *See id.* However, KPRC provided no evidence either that anyone, including the press, was discussing some *specific* question concerning rural health care and wound care or that the press was covering a debate regarding an issue related to rural health care or wound care, reporting what people were saying about the debate, and uncovering facts and theories to help the public formulate some judgment.

In its response to Dr. Dugi's reply brief, KPRC now argues on appeal that the "public controversy in this case is more similar to the controversy identified in *Einhorn*, 823 S.W.2d at 412." However, KPRC did not make this argument in its motion for summary judgment. *See* TEX. R. CIV. P. 166a(c) ("The motion for summary judgment shall state the specific grounds therefor."); *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 204 (Tex. 2002) ("A court cannot grant summary judgment on grounds that were not presented."); *Westbrook Const. Co. v. Fidelity Bank of Dallas*, 813 S.W.2d 752, 754-55 (Tex. App.—Fort Worth 1991, writ denied) ("The motion for summary judgment must itself state specific grounds on which judgment is sought. . . . The motion for summary judgment must stand or fall on the grounds it specifically and expressly sets forth. . . . There is authority to the effect that a summary judgment cannot be sustained on a ground not specifically set forth in the motion.").

KPRC also generally asserts in its response to Dr. Dugi's brief that the provision of economic health care in rural areas is a public controversy because every American taxpayer feels its ramifications. Again, KPRC neither made this argument in its summary judgment motions nor did it provide evidence to support such an argument. *See* TEX. R. CIV. P. 166a(c). Moreover, KPRC does not provide a clear and concise argument with citation to proper authority in support of this bare assertion. *See* TEX. R. APP. P. 38.1(i).

In its motion for summary judgment, KPRC merely established that rural health care is a general concern of the government and numerous private associations throughout the nation.[19] KPRC never identified a public debate involving rural medicine or wound care or identified a *specific* question being discussed.[20] Moreover, it did not identify a real dispute or claim that the outcome of a dispute involving rural health care and wound care affects the general public or some segment of it in an appreciable way.

---

[19] To support its assertion that Dr. Dugi had more than a trivial or tangential role in the alleged debate about rural health care services, KPRC cited a congressional hearing held in 2000, wherein Dr. Dugi offered testimony related to the following:

> Assess[ing] the preparedness of the Texas health care workforce to meet the health care needs of Texans beyond the year 2000, including methods to retain Texas-trained medical personnel. The committee shall evaluate the availability of health care providers in rural and urban areas. The Committee shall also review the oversight of medical procedures performed by medical residents and disclosure provided to patients prior to treatment.

KPRC did not contend that a public controversy exists concerning the evaluation of the availability of health care providers in rural and urban areas or the review of the oversight of medical procedures performed by medical residents and disclosure provided to patients prior to treatment. Therefore, to the extent that KPRC would have us construe these issues as a public debate surrounding rural health care, we decline to do so.

[20] Although it is possible that there are issues that may be debated in the context of rural health care and wound care, KPRC neither articulated a specific question being debated nor provided any evidence establishing that any public debate exists regarding either topic. We may not speculate about which issues regarding rural health care and wound care are being debated by the public without any evidence in the record.

14

*See Einhorn*, 823 S.W.2d at 412; *see also Firestone*, 424 U.S. at 454. Therefore, the evidence does not support a finding that there was any public controversy, involving people discussing a real question, the resolution of which was likely to impact persons other than those involved in the controversy.[21] Because a general concern will not suffice, and KPRC did not provide summary judgment evidence supporting a conclusion that a public controversy existed concerning the issues of rural medicine and wound care, we cannot conclude that the trial court erred in refusing to find as a matter of law that Dr. Dugi is a limited purpose public figure in this case. *See WFAA-TV, Inc.*, 978 S.W.2d at 572 (finding that a public controversy existed because "numerous commentators, analysts, journalists, and public officials were discussing . . . . the Branch Davidian raid" and concluding that "the raid was public, both in the sense that people were discussing it and people other than the immediate participants in the controversy were likely to feel the impact of its resolution"); *Klentzman*, 312 S.W.3d at 905-06 (stating that "the [summary judgment] evidence [did] not support a finding that there was any 'public controversy,' involving 'people discussing a real question,' 'the resolution of which was likely to impact persons other than those involved in the controversy'" and concluding that the plaintiff was not a limited purpose public figure merely because as the "son of the Chief Deputy," he "generally engaged in acts that 'would generate attention and discussion'"); *New Times, Inc. v. Wamstad*, 106 S.W.3d 916, 928 (Tex. App.—Dallas 2003, pet. denied) (relying on the substantial media

---

[21] Without citation to authority, in its discussion of whether Dr. Dugi had more than a trivial or tangential role in the debate about rural health care, KPRC claimed that Dr. Dugi engaged in marketing the use of Providex. However, KPRC offered no evidence in its motion for summary judgment that the marketing of Providex had been the focus of public debate before its broadcasts.

coverage of Wamstad and numerous articles written about him over the past 15-plus years, and "the public nature of the debate over his contentious relationships through his personal self-promotion in his advertising and his other interactions with the press–with all their attendant ramifications for the opinion-forming, consuming public" to conclude that a public controversy existed); *see also ZYZY Corp. v. Hernandez*, No. 04-10-00311-CV, 2011 Tex. App. LEXIS 490, at *12 (Tex. App.—San Antonio Jan. 26, 2011, no pet.) (mem. op.) (concluding that the media defendant's summary judgment evidence that included the reporter's record of the April 26, 2006 hearing and newspaper articles from the Eagle-Pass News Guide, the Eagle Pass Sunday News, the San Antonio Express-News, and the Dallas Morning News revealed "that the controversy that was the subject of the April 26, 2006 hearing was, in broad terms, the legitimacy of the leadership of the Kickapoo Traditional Tribe of Texas and the legitimacy of the court conducting the hearing").[22] Accordingly, as a private figure, Dr. Dugi was only required to show that KPRC acted negligently. *See Klentzman*, 312 S.W.3d at 905-06; *Entravision Commc'ns. Corp.*, 99 S.W.3d at 399-400. Therefore, we need not address KPRC's issues concerning whether Dr. Dugi presented evidence of

---

[22] Moreover, even if the general topics of rural health care and wound care involve public controversies, we are not convinced that the alleged defamation was germane to the plaintiff's participation, if any, in the debate of rural health care and wound care. KPRC contends that the topic of its "news stories reported allegations by a former nurse at Cuero Community Hospital that Dr. Dugi was involved in testing Providex on patients, that Dr. Dugi was the 'principal investigator' of the drug, and that he stood to gain financially by virtue of his ownership stake in Activ." The news reports never mentioned rural health care or the alleged debate surrounding rural health care. Moreover, in its motion for summary judgment, KPRC merely stated that its news stories were germane to Dr. Dugi's role in the public controversies of rural health care and wound care. However, KPRC did not articulate what those public controversies involved. It relied solely on its assertion that rural health care is a public concern and its unsubstantiated claim that there is a public debate regarding rural health care.

actual malice in order to defeat KPRC's motions for summary judgment. *See* TEX. R. APP. P. 47.1. We overrule KPRC's first issue.

## II. DENIAL OF KPRC'S NO-EVIDENCE MOTION FOR SUMMARY JUDGMENT

In a no-evidence motion for summary judgment, we consider the evidence in the light most favorable to the non-movant, crediting such evidence if reasonable jurors could and disregarding all contrary evidence and inferences unless reasonable jurors could not. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003) (citing *Wal-Mart Stores, Inc. v. Rodriguez*, 92 S.W.3d 502, 506 (Tex. 2002); *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 208 (Tex. 2002)); *see also City of Keller v. Wilson*, 168 S.W.3d 802, 825, 827 (Tex. 2005). A no-evidence point will be sustained when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact. *King Ranch, Inc.*, 118 S.W.3d at 751. A no-evidence summary judgment is properly granted if the respondent does not bring forth more than a scintilla of probative evidence to raise a genuine issue of material fact. *Id.*

> Less than a scintilla of evidence exists when the evidence is "so weak as to do no more than create a mere surmise or suspicion" of a fact. More than a scintilla of evidence exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions."

*Id.* (internal citations omitted)

A plaintiff suing for defamation will prevail if it proves:

17

that the defendant (1) published a statement (2) that was defamatory about the plaintiff (3) while acting with negligence if the plaintiff was a private individual, regarding the truth of the statement. *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998). A private individual may recover damages from a publisher for defamation upon a showing that the media defendant knew or should have known that the publication was false. *Foster v. Laredo Newspapers, Inc.*, 541 S.W.2d 809, 819-20 (Tex. 1976).

*Entravision Commc'ns. Corp.*, 99 S.W.3d at 399-400. A public figure must prove that the media defendant published the statement with actual malice through clear and convincing evidence. *Klentzman*, 312 S.W.3d at 897-98. Furthermore, to recover damages against a media defendant when the suit involves an issue of public concern, the plaintiff—whether a public figure or private individual—must prove by a preponderance of the evidence the falsity of the challenged statement.[23] *Id.* at 898. KPRC does not challenge the first two elements of defamation.

## A. Expert Report

By its second issue, KPRC argues that "the only evidence of custom presented in this case is [its] affidavits" and that "Dr. Dugi cannot demonstrate that it is customary in the news business to talk to every possible witness nor obtain all information on a source's credibility."[24] However, KPRC did not argue to the trial court that Dr. Dugi was

---

[23] "[T]he constitutional requirements of the First Amendment supersede the common law presumption" of the falsity of the defamatory statement, wherein the defendant bears the burden of proving the statement's truth. *Klentzman*, 312 S.W.3d at 898.

[24] In a footnote, KPRC cites *Scripps Texas Newspapers, L.P. v. Belalcazar*, 99 S.W.3d 829, 837 (Tex. App.—Corpus Christi 2003, pet. denied) for the proposition that in order to prove that a media defendant acted negligently, a plaintiff must provide expert testimony regarding the skill and experience normally possessed by a member of that profession. However, KPRC did not present this argument to the trial court. *See* TEX. R. CIV. P. 166a(c) ("The motion for summary judgment shall state the specific grounds therefor."); *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 204 (Tex. 2002) ("A court cannot grant summary judgment on grounds that were not presented."); *Westbrook Const. Co. v. Fidelity Bank of Dallas*, 813 S.W.2d 752, 754-55 (Tex. App.—Fort Worth 1991, writ denied) ("The motion for summary judgment must itself state specific grounds on which judgment is sought. . . . The motion for

required to provide evidence of custom from an expert witness. Because KPRC did not present such a ground to the trial court for summary judgment, we do not consider whether Dr. Dugi was required to provide expert evidence that it is customary in the news business to talk to every possible witness and to obtain all information on a source's credibility. *See* TEX. R. CIV. P. 166a(c); *Johnson*, 73 S.W.3d at 204; *Westbrook Const. Co.*, 813 S.W.2d at 754-55. Furthermore, as we explain below there was more than a scintilla of evidence to support the negligence element of Dr. Dugi's defamation claim. *See Entravision Commc'ns Corp.*, 99 S.W.3d at 399 (concluding that it was unnecessary to consider an expert's affidavit because, even without it, the plaintiff "provided this Court with more than a scintilla of evidence on the negligence element of his defamation claim").

## B.    Negligence

In its no-evidence motion for summary judgment, KPRC asserted that it was entitled to summary judgment "because there is no evidence that [it] knew or should have known that the alleged defamatory statements were false when it published the news stories on which Dr. Dugi's claims are based." On appeal, KPRC generally contends that it was entitled to a no-evidence summary judgment because "Dr. Dugi failed to produce any evidence to support the negligence element." We construe this as an argument that Dr. Dugi produced no evidence that KPRC knew or should have

---

summary judgment must stand or fall on the grounds it specifically and expressly sets forth. . . . There is authority to the effect that a summary judgment cannot be sustained on a ground not specifically set forth in the motion.").

known that the alleged defamatory statements were false when it published the news stories.

Dr. Dugi argues that KPRC possessed and reviewed information indicating that the allegations it published about him were false. Dr. Dugi claims that KPRC knew or should have known that he was not conducting drug experiments on illegal immigrants. At his deposition, Dean claimed that although he corroborated that Goosby made allegations that Dr. Dugi was conducting his drug experiments on illegal immigrants, he never discovered anything showing that Dr. Dugi ever treated or "experimented" on any illegal immigrants. Dean acknowledged that KPRC's policy includes a general rule that reference to race or national origin should not be made in a news story unless it has some legitimate news value. Dean then agreed that he published the alleged complaint about illegal immigrants "without being able in any way to corroborate that there was any truth to that."

Dr. Dugi asserts that KPRC knew or should have known that Dean's comparison of Dr. Dugi's use of Providex to the Tuskegee study was inaccurate. Dean admitted that he also reported that Goosby compared Dr. Dugi's alleged experiments on illegal immigrants to the Tuskegee study in the 1930's. Dean explained the Tuskegee study as follows:

> The government subjected black men in the armed forces to a vaccine for syphilis or possibly a placebo—but they were all part of one experiment—and did not tell the men; and some of them became sick. Some of them died. Some of them—there was a racial component there.

Although Dean stated that he researched the Tuskegee study before the news broadcasts, he did not document that research in his file. Dean stated that images were

20

taken from a "network video" about the Tuskegee study and used in his news story about Dr. Dugi. Dean stated that he was aware that many of the men in the Tuskegee study died and that there were racial overtones because all of the men in the study were African-American; however, he was unaware that some of the men spread syphilis to their spouses and then to their children. Dean acknowledged that, in his news report, he stated that the difference between the Tuskegee study and Dr. Dugi's alleged experiments was that Dr. Dugi stood to profit. Dean agreed that, before the news stories aired, he did not have any information regarding whether Dr. Dugi made any money from Providex and admitted that he could not find anything indicating that Dr. Dugi made a financial gain from the sale of the drug. Dean agreed that, unlike the Tuskegee study when the stories aired about Dr. Dugi, he had no indication that anyone had been harmed by Providex. Dean also agreed that another major difference between the two events was that in the Tuskegee study, every single individual used for testing was African-American, and in this case, Dean could not find any evidence that Dr. Dugi's alleged study had anything to do with race. Dean acknowledged that he reviewed the Activ notebook, which showed that nine of the Providex patients were Caucasian, one was African-American, eight were Hispanic, and one was not known.

Dr. Dugi alleges that KPRC knew or should have known that as an over-the-counter drug, Providex was not subject to the FDA's new drug approval process. Dean claimed that Providex was not approved by the FDA, and KPRC referred to it as a "mystery drug" during its broadcasts. However, Dr. Dugi presented evidence that Providex is an over-the-counter drug, which is not subject to the new drug approval

21

process. Dr. Dugi also provided evidence that when an OTC drug contains FDA OTC monographs—"a kind of 'recipe book' covering acceptable ingredients, doses, formulations, and labeling"—there is no need for the company marketing that OTC drug to acquire FDA pre-approval. Only new prescription drugs and OTC drugs that do not contain an FDA OTC monograph need pre-approval from the FDA. Evidence was presented that Providex is "an OTC product manufactured to existing [FDA] monographs for [OTC] products."

To show that Providex was allegedly not approved by the FDA, during one of the broadcasts, Dean conducted a search at the FDA website of Providex's NDC number. Dean stated, "When we enter the NDC number in the FDA's database, there's nothing on file." However, Dr. Dugi produced evidence that Dean entered the NDC number into the FDA's database which specifically states that it only includes prescription and diabetic drugs and that KPRC was aware that Providex was not a prescription or diabetic drug. Evidence was presented that Providex is an over-the-counter drug and that the NDC number would not be found in the database that Dean used during his broadcast. Dean testified at his deposition that he was aware that not all NDC numbers will be filed in the database he accessed during his broadcast, but that he still represented to his viewers that Providex's NDC number was not included in the FDA's database.[25]

---

[25] Frank Darryl Stefka stated in an affidavit that he was the Director of Pharmacy at CCH from March 1972 until 2004 and that his responsibilities included ensuring that "the pharmacy provided the appropriate level of services to meet the needs of the patients at [CCH]." According to Stefka, Providex was approved for CCH's formulary in 1999 and that a "formulary is a list of drugs which a hospital carries in its pharmacy to treat hospital patients." Stefka stated that benzothonium chloride, the main ingredient in Providex, is "a disinfectant commonly used in over the counter germ-killing products." Stefka asserted that as on OTC drug, Providex "never required a prescription" and that he believed it was an effective and

Viewing the evidence in the light most favorable to Dr. Dugi and disregarding all contrary evidence and inferences, we conclude that Dr. Dugi brought forth more than a scintilla of probative evidence to raise a genuine issue of material fact as to whether KPRC knew or should have known that their publication was false, *see King Ranch, Inc.*, 118 S.W.3d at 751. As such, the trial court properly denied KPRC's no-evidence motion for summary judgment. *Id.*

## C. Evidence of Actual Damages

KPRC also contends that Dr. Dugi failed to produce any evidence of actual damages. Dr. Dugi responds that because he provided evidence that KPRC committed defamation per se, actual damages are presumed.

In a case of defamation per se, actual damages to a victim's reputation are presumed.[26] *Leyendecker & Assocs. v. Wechter*, 683 S.W.2d 369, 374 (Tex. 1984) ("Once injury to reputation is established, a person defamed may recover general damages without proof of other injury."); *Knox v. Taylor*, 992 S.W.2d 40, 60 (Tex. App.—Houston [14th Dist.] 1999, no pet.) ("In the recovery on a claim of defamation per

---

safe product. In her incident report, Jalufka stated that "[b]efore placing the Providex product on formulary approximately six/seven years ago, my predecessor Mr. Stefka contacted the Texas State Board of Pharmacy and the University of Texas Health Science Center San Antonio Drug Information Line regarding its legitimacy and all were in agreement it [Providex] was fine to place on formulary pending approval from the Pharmacy and Therapeutics Committee (and it was approved) from my understanding. Jalufka also stated that CCH's formulary is "reviewed and approved by the medical staff at the Pharmacy and Therapeutics Committee meeting approximately the second Tuesday of February each year. The former Providex products [Durable Closure and Sore Relief] have been on formulary for approximately six or seven years and approved by the Pharmacy and Therapeutics Committee each year."

[26] "There is a difference, however, between general and special damages. Even if the statements have been determined to constitute defamation per se, proof of the actual injury suffered is required to recover special damages such as lost profits, incurred costs, lost time value, and future injury . . . ." *Tex. Disposal Sys. Landfill, Inc. v. Waste Mgmt. Holdings, Inc.*, 219 S.W.3d 563, 581 (Tex. App.—Austin 2007, pet. denied).

23

se, the law presumes actual damages and no independent proof of damages to reputation or of mental anguish is required."). "Thus, if the alleged statements have been classified as defamatory per se, general damages are presumed without requiring specific evidence of harm to the plaintiff's reputation thereby entitling the plaintiff to recover, at a minimum, nominal damages." *Tex. Disposal Sys. Landfill, Inc. v. Waste Mgmt. Holdings, Inc.*, 219 S.W.3d 563, 581 (Tex. App.—Austin 2007, pet. denied) (citing *Bentley v. Bunton*, 94 S.W.3d 561, 604 (Tex. 2002) ("As a matter of law . . . [defamatory per se statements] entitle [plaintiff] to recover actual damages for injury to his reputation and for mental anguish"); *Snead v. Redland Aggregates Ltd.*, 998 F.2d 1325, 1331 (5th Cir. 1993)).

Defamation per se is spoken, written, or printed words that are so obviously hurtful to the person aggrieved that they require no proof of their injurious character to make them actionable. *Knox*, 992 S.W.2d at 50. "A false statement will typically be classified as defamatory per se if it injures a person in his office, profession, or occupation; charges a person with the commission of a crime; imputes sexual misconduct; or accuses one of having a loathsome disease." *Tex. Disposal Sys. Landfill, Inc.*, 219 S.W.3d at 581; *see also Zepeda v. Indus. Site Servs.*, No. 13-07-00579-CV, 2008 Tex. App. LEXIS 8360, *11 (Tex. App.—Corpus Christi Nov. 6, 2008, no pet.) (mem. op.).

In its news broadcasts, KPRC stated that Dr. Dugi conducted illegal drug testing on illegal immigrants and on his patients without their consent. KPRC also stated that a criminal investigation had been launched into Dr. Dugi's activities and that a federal

24

grand jury would consider criminal charges in this case.[27]  Therefore, KPRC charged Dr. Dugi with the commission of a crime.  Moreover, KPRC reported that Dr. Dugi experimented on his patients without their consent using an illegal drug that the FDA did not approve.  These allegations, if false, would support a conclusion that Dr. Dugi was injured in his office, profession, or occupation.  *Tex. Disposal Sys. Landfill, Inc.*, 219 S.W.3d at 581; *see also Zepeda*, 2008 Tex. App. LEXIS 8360 at *11.  We conclude that there was more than a scintilla of evidence presented that raised a genuine issue of material fact regarding whether KPRC committed defamation per se.[28]  *See King Ranch, Inc.*, 118 S.W.3d at 751.  Therefore, there is a genuine issue of material fact regarding whether actual damages in this case are presumed.  *See Leyendecker & Assocs.,* 683 S.W.2d at 374; *Knox*, 992 S.W.2d at 60.  Viewing the evidence in the light most favorable to Dr. Dugi and disregarding all contrary evidence and inferences, we conclude that the trial court properly denied KPRC's no evidence motion for summary judgment.  *See King Ranch, Inc.*, 118 S.W.3d at 751.  We overrule KPRC's second issue.[29]

---

[27] KPRC did not specify the crime that Dr. Dugi allegedly committed.

[28] On appeal, KPRC alleges that the defamatory statements in this case involved a matter of public concern; therefore, Dr. Dugi, even as a private individual, must have proven actual malice in order to recover any presumed or punitive damages.  However, KPRC did not assert to the trial court that Dr. Dugi was required to prove actual malice in order to recover any presumed or punitive damages because the defamatory statement involved a matter of public concern.  *See Klentzman v. Brady*, 312 S.W.3d 886, 907 n.7 (Tex. App.—Houston [1st Dist.] 2009, no pet.).  Accordingly, we may not consider this ground for summary judgment.  *See id.*

[29] As a sub-issue to its second issue, KPRC contends that the trial court erred in overruling its "objections to a number of statements in Dr. Dugi's affidavit on the bases that they were speculative and contained unsubstantiated factual and legal conclusions."  KPRC complains that without this evidence, Dr. Dugi failed to produce any evidence that he suffered actual damages.  However, because we have concluded that Dr. Dugi produced evidence to create a fact issue that KPRC committed defamation per se, we need not address this contention, as it is not dispositive of this appeal.  *See* TEX. R. APP. P. 47.1.

### III. TRADITIONAL MOTION FOR SUMMARY JUDGMENT

By its third issue, KPRC contends that the trial court should have granted its traditional motion for summary judgment because it proved as a matter of law that the news broadcasts were substantially true. Essentially, KPRC argues that Dr. Dugi has failed to show he has a defamation claim because a showing of substantial truth of a publication in a defamation cause of action negates the essential element of falsity. *See McIlvain v. Jacobs*, 794 S.W.2d 14, 15 (Tex. 1990). Thus, if KPRC has negated the falsity element of defamation, KPRC asserts that it is entitled to summary judgment as a matter of law. *See id.* at 16.

### A. Standard of Review and Applicable Law

We review the granting of a traditional motion for summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003); *Branton v. Wood*, 100 S.W.3d 645, 646 (Tex. App.—Corpus Christi 2003, no pet.). "[W]e take as true all evidence favorable to the non[-]movant, and we indulge every reasonable inference and resolve any doubts in the non[-]movant's favor." *Valence Operating Co.*, 164 S.W.3d at 661.

In a traditional motion for summary judgment, the movant has the burden to establish that no genuine issue of material fact exists and that he is entitled to judgment as a matter of law. *Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002) (citing TEX. R. CIV. P. 166a(c)); *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex. 1979). A defendant seeking a traditional motion for summary judgment

26

must either disprove at least one element of each of the plaintiff's causes of action or plead and conclusively establish each essential element of any affirmative defense. *Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex. 1995) (per curiam); *Sanchez v. Matagorda County*, 124 S.W.3d 350, 352 (Tex. App.—Corpus Christi 2003, no pet.).

In determining whether the allegedly defamatory broadcast was true, Texas courts apply the "substantial truth" test. *McIlvain*, 794 S.W.2d at 16. To determine whether a communication is substantially true, the courts must determine the gist of the broadcast. *Id.*; *KTRK Television v. Felder*, 950 S.W.2d 100, 105 (Tex. App.—Houston [14th Dist.] 1997, no writ). So long as "the substance, the gist, the sting, of the libelous charge" is justified, minor inaccuracies will not constitute falsity. *Masson v. New Yorker Magazine*, 501 U.S. 496, 517 (1991). Summary judgment in favor of a media defendant is appropriate if the communication at issue is substantially true. *McIlvain*, 794 S.W.2d at 15.

However, when news stories involve the reporting of allegations by a third party, as in this case, the media defendant is not required to prove that the underlying allegations under investigation were true in order to show substantial truth. *Felder*, 950 S.W.2d at 105. Instead, the media defendant may rely on proof that the allegations were in fact made, accurately reported, and under investigation when reported in order to prove that the communication was substantially true. *Felder*, 950 S.W.2d at 106; *UTV of San Antonio, Inc. v. Ardmore, Inc.*, 82 S.W.3d 609, 612 (Tex. App.—San Antonio 2002, no pet.) ("When a case involves a media defendant, the defendant need only prove that third party allegations reported in a broadcast were, in fact, made and

27

under investigation; it need not demonstrate the allegations themselves are substantially true."); *Grotti v. Belo Corp.*, 188 S.W.3d 768, 771 (Tex. App.—Fort Worth 2006, pet. denied) ("We hold that the Media Defendants established the substantial truth of each broadcast by accurately reporting third-party allegations and investigations."). "Otherwise, the media would be subject to potential liability everytime it reported an investigation of alleged misconduct or wrongdoing by a private person, public official, or public figure. Such allegations would never be reported by the media for fear an investigation or other proceeding might later prove the allegations untrue, thereby subjecting the media to suit for defamation." *Felder*, 950 S.W.2d at 105. The defendant has the burden of establishing the affirmative defense of truth. *See UTV of San Antonio, Inc.*, 82 S.W.3d at 610.

**B.    Discussion**

KPRC argues that the record is replete with Goosby's "allegations about the illegal drug testing" and that "Goosby's allegations of illegal drug testing were under investigation when KPRC published the News Stories." Dr. Dugi responds that a fact issue exists regarding what allegations were made and whether the allegations reported by KPRC were under investigation. We agree with Dr. Dugi.

KPRC has the burden of proving that the allegations it relied on were actually made by Goosby, accurately reported, and under investigation in order to establish its defense of substantial truth. *See UTV of San Antonio, Inc.*, 82 S.W.3d at 612. Citing numerous documents in the record, KPRC argues that it "presented sufficient evidence to prove that Goosby made the allegations and that they were under investigation." In

28

its brief, KPRC claims that Goosby complained on numerous occasions to different entities that Dr. Dugi was testing an illegal and unapproved drug on patients in a rural area and that Dr. Dugi was under investigation.

Many of the documents included in the record written by Goosby and allegedly sent to several agencies accuse two nurses of administering an alleged illegal drug from a "Latin American country" to patients at CCH; these documents do not mention Dr. Dugi or his alleged financial interest in the drug company that promoted and marketed Providex.[30] There is only one document accusing Dr. Dugi of performing illegal drug tests written by Goosby in the record that was sent to Dean before the news broadcasts. This document entitled, "Abridged Letter to the U.S. Department of Justice" ("DOJ") accuses Dr. Dugi of allegedly testing an illegal drug on his patients without their consent.[31] However, at his deposition, Goosby testified that this document was a draft that had not been sent to any agency because it was obviously incomplete. Goosby claimed that he no longer had a copy of the final draft that he actually sent to the DOJ, which he had changed, and a copy of the final draft is not included in the summary judgment evidence.[32]

---

[30] KPRC did not include Goosby's allegations against these two nurses in its news reports. In one document, Goosby accused one of the nurses of being "deeply involved in the illegal drug testing" and of "personally dispens[ing] almost every dose to be administered." Goosby claimed that this nurse conspired with other nurses "to make false statements against" Goosby because he had reported "illegal activity involving drug diversion, and Medicare/Medicaid fraud" by another nurse.

[31] The other documents written by Goosby and allegedly sent to the FDA and FBI stating that Dr. Dugi participated in illegal drug tests without his patients consent were sent to Dean on February 1, 2008—after the first news broadcast aired. Therefore, KPRC could not rely on these documents. *See UTV of San Antonio, Inc. v. Ardmore*, Inc., 82 S.W.3d 609, 611-12 (Tex. App.—San Antonio 2002, no pet.) (providing that the allegations must have been under investigation for the media defendant to rely on the defense of substantial truth).

[32] There is nothing in the record which shows that Goosby actually sent the final draft to the DOJ

KPRC argues that Dean received evidence of Goosby's correspondence with the FDA. The correspondence is attached to an email Goosby sent to Dean on February 1, 2008, after KPRC first aired its news broadcast reporting that Dr. Dugi performed illegal drug tests on his patients without their consent. In the email, Goosby claimed that he sent the attached letter to Sandy Ziegler of the FDA and that Ziegler responded requesting answers to some questions. However, this evidence merely shows that Goosby drafted a letter to Ziegler; there is nothing from Ziegler addressed to Goosby showing that Goosby received a letter from Ziegler.[33] Furthermore, at his deposition, Dean admitted that when Gourley requested for Dean to forward all documents in his possession that were filed or sent to the FDA or TMB, Dean told Gourley "There are no documents."[34]

In the first broadcast, after reporting that Dr. Dugi had allegedly used an unapproved drug on his patients without their consent, Dean stated that "the FDA is investigating tonight, but that agency would not elaborate." However, Dean did not state that the FDA was investigating Dr. Dugi's alleged participation in the illegal drug

___

or any other agency.

[33] In his email to Dean, Goosby stated that Ziegler "sent me additional questions for me to answer." Two letters from Goosby to Ziegler were attached to the email. In the second letter, Goosby stated he was answering questions that Ziegler allegedly asked. The record does not contain any correspondence from Ziegler to Goosby requesting answers to these questions.

[34] During Goosby's deposition, portions of his videotaped interview with Dean were played. In his interview, Goosby stated, "No, no. I was using my own name. They all acted as if I was fabricating. No one was interested—even when I called the FBI recently—'I started at the Office of the Inspector General in Washington, D.C., shift down, shift down, shift down, shift down." In his deposition, Goosby explained that when he spoke to Elizabeth Higginbotham of the TBN, she indicated that she thought Goosby was not being truthful.

testing.[35]  In the February 1, 2008 morning broadcast, Dean stated that although Goosby filed complaints with the FDA, FBI, the state medical board, the state pharmacy board, and state legislators, "nothing had happened so [Goosby] called [KPRC]."[36]  This evidence implies that Goosby's alleged complaints were ignored by every agency listed, thus, supporting a conclusion that those agencies had not begun investigating his allegations.  In this same report, Dean spoke with a representative of the Texas Medical Board who informed Dean that that agency was not conducting an investigation into Goosby's allegations against Dr. Dugi.[37]  In its February 1, 2008 evening broadcast, the KPRC anchor stated, "The FDA has now launched an investigation in the human drug testing uncovered by Local 2 Investigates."  Indulging every reasonable inference and resolving any doubts in Dr. Dugi's favor, this evidence implies that the FDA started its investigation after KPRC "uncovered" the "human drug testing."  *See Valence Operating Co.*, 164 S.W.3d at 661.

In its third broadcast, KPRC reported that a "new investigation" had been launched by the "Hospital Board" into "allegations that an experimental drug was tested on unsuspecting patients south of Houston."  In its fourth broadcast, the news anchor

---

[35] The record contains evidence that Goosby complained to the TBN that two nurses had been involved in testing a drug from a Latin American country.

[36] On February 1, 2008, Goosby sent Dean a letter, dated November 20, 2007, he allegedly sent to "Agent Vic Hartman."  In the letter Goosby stated that the TBN "never checked into the charges that there were [sic] illegal drug testing being performed at Cuero Community Hospital" and that he had reported some of the allegations "to several agencies including the Texas Medicaid provider, the Texas State legislature, the TBN, and other agencies from the beginning, and have been ignored and have received apathetic responses."

[37] In an email sent to Brian Sasser, an investigative producer at KPRC, on March 25, 2008, Dean stated, "Texas Medical Board just launched its investigation (finally).  They will subpoena our stuff next week and they've already requested and received a response from the drug maker."

reported, "We've been looking into the mystery surrounding several drugs being tested on hundreds of patients throughout Texas. Tonight these drugs have stopped being sold as part of an FDA investigation launched because of Local 2 Investigates." In its fifth broadcast, the following exchange occurred:

[Anchor 1]:        Two separate government investigations are underway tonight, following our series of reports on a possible drug experiment uncovered by Local 2 Investigates.

[Anchor 2]:        A state agency and federal investigators are now looking into allegations by hospital workers just south of Houston, who say the patients were used really as human guinea pigs without their knowledge.

Dean:              Food and Drug Administration investigators now have stacks of records from Cuero Community Hospital south of Houston near Victoria.

                   . . . .

                   Now, Local 2 Investigates has been contacted by the state agency that disciplines doctors.

                   . . . .

                   The Texas Medical Board could take action against the doctor for using an unapproved drug, of if the agency proves he tested it on patients without the patients knowing they were part of a study, that's something Dr. Dugi denies.

                   The State Medical Board could take months to wrap up its investigation, but the F-D-A inquiry is expected to go to a federal grand jury within the next month, that body will consider criminal charges in this case.

Indulging every reasonable inference and resolving any doubts in Dr. Dugi's favor, this evidence appears to show that the FDA and the State Medical Board started

32

an investigation into Dr. Dugi's alleged involvement in the illegal drug testing only after KPRC's news reports. *Valence Operating Co.*, 164 S.W.3d at 661. Finally, in an online article, Dean wrote that "[t]he Food and Drug Administration had already launched a criminal investigation in response to the Local 2 Investigates reports." Again, this implies that the FDA did not begin its alleged investigation into Dr. Dugi's involvement until after KPRC aired its news reports.

KPRC relies on Dean's deposition testimony that several FDA personnel allegedly told him that an investigation had been started into Dr. Dugi's alleged involvement in the illegal drug testing. However, "[o]ur summary judgment rule permits the granting of a summary judgment on the basis of uncontroverted testimonial evidence of an interested witness if that evidence 'is clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted.'" *Casso v. Brand*, 776 S.W.2d 551, 558 (Tex. 1989). Dean's news reports contradict his assertions that the FDA had begun an investigation into Goosby's allegations against Dr. Dugi before KPRC aired them.[38]

KPRC also complains that the trial court erroneously excluded an "Enforcement Report for March 26, 2008" posted on the FDA's website that KPRC claims proves that Goosby's allegations were under investigation. The report states that Activ initiated a recall of sore relief and durable closure (Providex) by letter on January 21, 2008.

---

[38] We note that Dean claimed that he attempted to contact Murray to corroborate Goosby's allegations, but that she was not available; however, in an affidavit, Murray stated that she never spoke with Dean and that Dean had not left any messages for her "or [made] any efforts to contact [her] of which [she] was aware." Murray stated that she would have informed Dean that she had never seen Dr. Dugi experiment or test a drug on his patients and that she had not asked Goosby to help her expose such testing of Providex.

However, even assuming, without deciding, that the trial court abused its discretion in excluding this evidence, this document merely shows that Activ voluntarily recalled Providex. There is nothing in the document indicating that Goosby made any allegations regarding Dr. Dugi; that the FDA or any other agency had launched an investigation of Dr. Dugi; or that the medication was recalled in response to Goosby's allegations. Furthermore, the trial court admitted the actual recall letter dated February 21, 2008, written by Gourley to Activ's customers informing them that Activ was voluntarily recalling existing inventories of sore relief and durable closure (Providex). Therefore, even had the trial court admitted the enforcement report, it merely raises a fact issue regarding when Activ initiated its voluntary recall.[39] KPRC also complains that the trial court abused its discretion in admitting Gourley's affidavit and the February 21, 2008 letter. However, again assuming, without deciding, that the trial court erroneously admitted these documents, the enforcement report itself does not prove that Goosby informed the FDA that Dr. Dugi was testing an illegal drug on his patients without their consent or that the FDA had begun an investigation of Dr. Dugi. The enforcement report merely shows that Activ voluntarily recalled Providex.

Based on the summary judgment record, including KPRC's own news reports, we conclude that a genuine issue of material fact exists concerning whether: (1) Goosby made allegations to any agency that Dr. Dugi used an illegal drug on his patients without their consent before KPRC's news reports; (2) KPRC reported those allegations accurately; and (3) there was an investigation into Goosby's allegations.

---

[39] In its brief, KPRC agrees that the letter contradicts the enforcement report, which goes to the weight of the evidence.

*See Sw. Elec. Power Co.*, 73 S.W.3d at 215; *City of Houston*, 589 S.W.2d at 678.

Accordingly, we hold that KPRC has not met its burden of establishing the affirmative

defense of truth or that it is entitled to summary judgment as a matter of law.[40]  *See Sw.*

*Elec. Power Co.*, 73 S.W.3d at 215; *City of Houston*, 589 S.W.2d at 678.  We overrule

KPRC's third issue.

## IV.    CONCLUSION

We affirm the trial court's denial of KPRC's motions for summary judgment.

_____
ROGELIO VALDEZ
Chief Justice

Delivered and filed the
16th day of June, 2011.

---

[40] In its reply brief, KPRC states, "Dr. Dugi provides no evidence that the Goosby [sic] did not file these complaints with state and federal agencies or that the complaints did not allege that Dr. Dugi was testing an unapproved drug on patients without consent."  However, to establish its defense of substantial truth, KPRC had the burden of establishing that Goosby made the allegations and that those allegations were under investigation.  *See id.* at 610.